**Miguel A. RICHARDSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 68934.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 28, 1987.

Allen Cazier (Court-appointed), San Antonio, for appellant.

1. We will use the term "ground of error," because it was proper when appellant's appeal was filed and was used by appellant in his brief.

Fred G. Rodriguez, Dist. Atty. & Keith Burris, Steve Hilbig, James L. Bruner & Daniel Thornberry, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM.

Appellant was convicted of capital murder. The special issues required under Article 37.071(b), V.A.C.C.P., were submitted to the jury and were answered in the affirmative. Punishment was assessed at death. Having reviewed appellant's twelve grounds of error, we affirm.[1]

We will first consider appellant's eleventh ground of error, in which he makes his sole complaint regarding voir dire examination. He complains of the improper excusal of prospective juror William Noble. Earlier during the examination of Noble, the trial court overruled the State's challenge for cause on *Witherspoon* grounds.[2] Later, however, Noble was excused *sua sponte* by the trial judge after Noble stated that he had already formed an opinion as to guilt or innocence. As stated in appellant's brief: "Defense counsel objected on the basis that Mr. Noble was being excused by the court without the full predicate for his excuse [sic] having been laid. The court replied that when a prospective juror states that he has already formed an opinion as to the guilt or the innocence of the defendant there should be no further questioning. Defense counsel then pointed out that an additional sentence is contained in the article in question." The entire exchange is herein set out:

> "[NOBLE:] You used a couple of words there, bias and impartial that I think you might want to pursue.
>
> "[DISTRICT ATTORNEY:] Well, are you biased in some manner about this case?

2. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

"[NOBLE:] Well, I have read quite a bit about it. And I feel that I have already prejudged the case. I mean I take all the newspapers. I'm a journalist by profession and I know—I don't disregard what I see in the paper.

"THE COURT: Have you already formed an opinion as to the guilt or innocence?

"[NOBLE:] Yes, Your Honor. I think it's only fair that I say that I have formed an opinion.

"THE COURT: You will be excused Mr. Noble. You can return to the Central Jury Room. They will discharge you from there.

\* \* \* \* \* \*

"[APPELLANT'S ATTORNEY:] If the Court please, the Defendant objects to Mr. Noble being excused, the entire predicate not having been laid for his excuse.

"THE COURT: You are excused.

\* \* \* \* \* \*

"THE COURT: The statute provides if the juror states from hearsay or otherwise he has already formed an opinion as to the guilt or innocence of the Defendant there will be no further questioning.

"[APPELLANT'S ATTORNEY:] Does it say one more sentence?

"THE COURT: [Ignoring the last remark of appellant's attorney] Can you do one [another juror] in ten minutes?

"[DISTRICT ATTORNEY:] No sir.

"[APPELLANT'S ATTORNEY:] I would say that we—

"THE COURT: Mr. Williams [District Attorney] says no. I'll accept that. Let's recess until 1:30, gentlemen."

. [Lunch Recess Declared]

The statute referred to, Art. 35.16(a)(10), V.A.C.C.P., provides in pertinent part that a challenge for cause may be made for the following reason:

"That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court. If he answers in the negative, he shall be further examined...."

 Contrary to the State's argument in its brief on appeal, we find the objection of appellant's counsel, although not a model in specificity, was sufficient to preserve his complaint on appeal that an Art. 35.-16(a)(10) challenge for cause requires more than that the juror express that he has established a conclusion as to a defendant's guilt or innocence. It is readily apparent that appellant's counsel was attempting to alert the trial judge that Noble needed to be asked whether, in his opinion, the conclusion would influence him in his action in finding a verdict. Absent this question, made mandatory by the statute, the predicate for excusal had not been laid. Indeed, even if the question had been asked and answered, the predicate for excusal would only be complete if the reply were yes. A negative reply calls for further specific questioning about the extent to which the conclusion will affect his action, followed by a discretionary decision by the trial judge concerning the venireman's impartiality.

It is clear then that the predicate for excusal under Art. 35.16(a)(10) had not been laid and that the objection of appellant's attorney specifically directed the trial court's attention to the missing portion of the predicate. The overruling of said objection constituted error. It remains to be seen whether such error requires reversal.

 When a trial judge erroneously excuses a prospective juror over the objection of defense counsel, the general rule is that this is not error requiring reversal unless there is a showing that appellant was harmed by the trial court's action. *Culley v. State*, 505 S.W.2d 567 (Tex.Cr. App.1974); *Henriksen v. State*, 500 S.W.2d

491 (Tex.Cr.App.1973); *Weaver v. State,* 476 S.W.2d 326 (Tex.Cr.App.1972). In *Payton v. State,* 572 S.W.2d 677, 680 (Tex.Cr. App.1978), this Court held that "[h]arm may be shown in the erroneous exclusion of a qualified juror by showing the State exhausted its peremptory challenges." If the State has exhausted all of its peremptory challenges, the trial court's action, "from the perspective of the defendant, [was] the same as if the State had been given an extra peremptory challenge." *Payton,* supra at 680; *Martinez v. State,* 621 S.W.2d 797 (Tex.Cr.App.1981). When the State does not use all of its strikes in the jury selection process, however, harm is not shown because had the judge refused the challenge for cause the State could have (and most assuredly would have) peremptorily struck the person from the jury at the conclusion of the voir dire. Thus, by reserving an unused peremptory challenge the State is permitted a constructive use against the erroneously excluded venire member. *Payton,* supra; *Culley,* supra; *Weaver,* supra.

In capital cases, however, it is ordinarily immaterial that the State had strikes remaining at the end of the voir dire examination. If the trial court erroneously sustains a State's challenge for cause over defense objection during individual voir dire in a capital case, this has the immediate effect of giving the State an additional peremptory strike. *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1981). As stated in *Grijalva,* supra at 424:

"The manner of exercising peremptory challenges is explicitly differentiated in Arts. 35.13 and 35.25, V.A.C.C.P. The procedure followed in *Chambers* [*v. State,* 568 S.W.2d 313 (Tex.Cr.App. 1978)] and this case is stated in Art. 35.13, supra:

'A juror in a capital case in which the state has made it known it will seek the death penalty, held to be qualified, shall be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause.'

"On the other hand, in non-capital cases, such as those upon which *Chambers* relied, the procedure is quite different, as provided in Art. 35.25, supra:

" 'In non-capital cases and in capital cases in which the State's attorney has announced that he will not qualify the jury for, or seek the death penalty, the party desiring to challenge any juror peremptorily shall strike the name of such juror from the list furnished him by the clerk.' "

To allow the State to render harmless the improper challenge for cause and excusal of a venire member by the simple expedient of not using all of the State's peremptory challenges would be, as stated in *Grijalva,* supra at 424–425:

"... corruption of the peremptory strike practice that violates the terms of Art. 35.13, supra, and gives an unfair advantage to the State in the jury selection process.

First, to allow the State to exercise its peremptory challenges in a capital case after conclusion of the voir dire examination gives it the benefit of making its judgments with a perspective of the entire panel, a perspective that is not given the defendant.

Second, giving such a privilege to the State allows it to withhold its strikes until after the defendant has exercised his strikes, even though Art. 35.13, supra, explicitly states that the qualified venireman shall be passed first to the state and then to the defendant. The statute would give the benefit to the defendant in instances where both sides might desire to strike the same venireman. Allowing the State to wait until the end of the selection process would transfer that benefit to the State.

Third, to allow retrospective exercise of peremptory challenges *on appeal* gives the State even greater advantages. When used on appeal the State effectively postpones exercise of its strikes until error has been found, and then with the benefit of the ruling of this Court as its guide the State can maximize the accuracy of the strikes not used at trial. In actuality this Court not only counsels the State, but actually exercises the strike

for the State. In effect a peremptory strike against a prospective juror is transformed into a peremptory strike against a ground of error." (Emphasis in original) [3]

In *Bell v. State*, 724 S.W.2d 780 (Tex.Cr. App.1986), we set forth the rules relative to jury selection and its review, and stated, *id.* at 795:

"Before addressing appellant's specific contention, we will make a brief recitation of the rules regarding jury selection and the harm a defendant must show in order to merit reversal. If a trial court erroneously overrules a defendant's challenge for cause, the defendant may establish harm by showing: (1) exhaustion of his peremptory challenges; (2) denial of a request for additional peremptory challenges; and (3) the seating of a juror upon whom the defendant would have exercised a peremptory challenge. *East v. State*, 702 S.W.2d 606 (Tex.Cr.App. 1985); *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1981), *cert. denied*, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr.App.1978); *Payton*, supra. In non-capital murder cases, if the trial court erroneously grants a State's challenge for cause and excludes a qualified juror, the defendant may establish harm simply by showing that the State exhausted all of its peremptory challenges. In such a case the court has effectively given the State the benefit of an additional peremptory challenge. *Payton*, supra. See also *Culley v. State*, 505 S.W.2d 567 (Tex.Cr.App.1974); and *Weaver v. State*, 476 S.W.2d 326 (Tex.Cr. App.1972). In capital murder cases, if the trial court improperly sustains a State's challenge for cause and excludes a qualified juror, over a defendant's objection, reversible error arises regardless of whether the State has exhausted its peremptory challenges. This is because peremptory strikes are exercised after each prospective juror is questioned, un-

der Art. 35.13, V.A.C.C.P., as opposed to after the entire panel is questioned in a non-capital case. *Grijalva v. State*, 614 S.W.2d 420 (Tex.Cr.App.1981). See also *Turner v. State*, 635 S.W.2d 734 (Tex.Cr. App.1983)."

We then observed that the rules are different when a trial court excuses a prospective juror *sua sponte:*

"When the trial court *sua sponte* excludes a *qualified* juror, the situation must be distinguished from a similar excusal that is prompted by the State. *Grijalva*, supra, held that any State's unused peremptory strikes remaining at the end of voir dire would not remove the harm of an erroneous excusal of a qualified juror. This conclusion is based on the notion that otherwise the State would receive three unfair advantages over the defense: (1) hindsight in exercising peremptory strikes that was denied to the defense; (2) the benefit of striking last that is statutorily given to the defense by Art. 35.13, V.A.C.C.P.; and (3) the benefit of having the court strike, on behalf of the State, a venireman on appeal after voir dire error has been pronounced. But *Grijalva* is founded on the notion that the State *caused* the improper excusal by issuing a challenge for cause, and is therefore penalized because of the advantages it would otherwise receive by holding a peremptory strike back. Where the trial judge, not the State, is solely responsible for the improper excusal, the justification for penalizing the State under *Grijalva* disappears. It is entirely appropriate in such a case to fall back on the rationale in *Weaver*, supra, *Payton*, supra, and *Culley*, supra, and assess harm to the defendant on whether the state had remaining peremptory strikes left at the close of the voir dire."

*Bell*, supra at 795–6.

Thus, just as in the case now before the Court:

---

**3.** Although the venire member in *Grijalva*, supra, was erroneously excluded on *Witherspoon*, supra, grounds, the rationale of *Grijalva* clearly applies to all challenges for cause in death penalty cases since this Court specifically held that the decision was based on State law grounds and was not limited to *Witherspoon* error. *Grijalva*, supra at 425.

"In the case at bar, the State had remaining at the conclusion of jury selection a total of one peremptory strike. Unlike *Grijalva,* however, the venire member in this case was not excused via challenge for cause by the State. The trial judge excused him *sua sponte.* The State in no way prompted the erroneous excusal nor did it have an opportunity to timely exercise a peremptory challenge against him had it wished to. In short, this venire member was never passed first to the State and then to the appellant for challenges according to the requirements of Art. 35.13, V.A.C.C.P. Thus, the 'corruption of the peremptory strike practice' that gave the State 'an unfair advantage,' so condemned in *Grijalva,* supra at 424, is absent from this case."

■ We find that *Grijalva,* supra, is distinguishable from this case since the trial judge excused the venireman *sua sponte* rather than as the result of a challenge for cause by the State, thus depriving the State of the orderly opportunity to challenge peremptorily. Therefore, we hold that the existence of unused peremptory strikes at the conclusion of the jury selection process renders the improper excusal of the venireman harmless. *Culley,* supra; *Weaver,* supra.

■ In this same ground of error, appellant also appears to complain that the *sua sponte* nature of the trial court's action in excusing Noble was in and of itself sufficient to require reversal. Although the trial court should not have on its own motion excused the venire member on grounds which do not show an absolute disqualification under the authority of Art. 35.19, V.A.C.C.P., appellant's objection at trial did not address the *sua sponte* nature of the trial court's action. Thus, appellant's complaint on appeal does not comport with his objection at trial. This error is not preserved for review. *Hernandez v. State,* 643 S.W.2d 397 (Tex.Cr.App.1982); *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr.App.1980), *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66

L.Ed.2d 251 (1980); *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). Even if error had been preserved, it was harmless since the State had peremptory strikes left. See discussion, supra. Appellant's eleventh ground of error is overruled.

Although appellant does not challenge the sufficiency of the evidence, a brief recitation of certain relevant facts is assistive in disposing of appellant's remaining grounds of error.

The victim of the offense was a security guard at the Holiday Inn in San Antonio. He and another security guard were dispatched early in the morning of March 31, 1979, to investigate a complaint from a guest in room 494 that someone was trying to break into her room. Room 494 was occupied by three women from Mexico City. Shortly after the front desk clerk had sent the two unarmed security guards to investigate the complaint, the guest in room 494 called again and stated she thought she had heard gunshots. Eventually the front desk clerk found the bodies of the two security guards lying in a first floor stairwell. One victim had his hands handcuffed behind his back and both had been shot at close range with a .38 caliber Arminius Titan Tiger pistol.[4] Appellant had acquired a .38 caliber Arminius Titan Tiger pistol several days earlier.

The evidence also reflected that at the time of the offense appellant and the three young women who were traveling with him occupied the room across the hall from room 494. The three young women, seventeen-year-old Victoria Franklin, sixteen-year-old Rhonda Bearden, and seventeen-year-old Lisa Laursen, were working as prostitutes in the various cities the group visited. All three women testified at the trial. On the evening before the offense, the appellant had mentioned that one of the women from Mexico City was wearing what he considered to be expensive jewelry. According to Franklin's testimony, ap-

---

**4.** A firearms and toolmark examiner for the San Antonio Police Department testified that the make of the pistol used in the offense could be and was determined by bullets recovered from the body of the victim.

pellant awakened her on the morning of the offense and told her he had disguised himself and, armed with the .38 caliber pistol, had attempted to gain entry to the room occupied by the women from Mexico City. Before gaining entry, he was interrupted by the two security guards. The guards were escorting appellant down the stairs to the front desk in order to establish his identity when appellant's weapon, which was in his waistband, fell to the floor. He grabbed the gun, handcuffed one of the guards, took their money, shot and killed both of them, and returned to his room. Upon his request, Franklin went to the scene of the murders and wiped the area with a towel to remove any fingerprints. The victims had not yet been discovered and Franklin saw them lying in the stairwell. She then returned to the room and disposed of the bullets and spent shells by flushing them down the toilet.

Appellant and Franklin later told Bearden about the murders. While in Colorado awaiting extradition to Texas, appellant also confessed to Mark Stanley Seiver, another inmate.

In his first ground of error, appellant contends that the trial court erred in finding that Franklin was not the common-law wife of appellant and in permitting her to testify against appellant in violation of the husband-wife privilege embodied in Art. 38.11, V.A.C.C.P.[5]

In response to defense counsel's leading questions during a hearing held outside the presence of the jury, both Franklin and appellant testified that they had entered into a valid common-law marriage shortly after Franklin's seventeenth birthday "on or about the latter part of January into

February 1979" while they were living together in Oklahoma. During cross-examination, however, Franklin admitted that appellant never introduced her to anyone as his wife, that she did not tell other people that they were "married" until after her arrest several months later, and that the vows were secret.[6] Franklin also testified that a couple of weeks after they exchanged these "secret vows" Rhonda Bearden entered the picture and appellant was introducing Bearden as his wife. Lisa Laursen also occasionally acted as appellant's wife. It was Laursen who registered as appellant's wife at the Holiday Inn in San Antonio. Franklin also testified that Bearden, not Franklin, shared appellant's bed during their travels.

Assistant District Attorney Keith Burris testified that he specifically asked Franklin in September of 1979 if she had ever been married to appellant and she "emphatically" denied the same. He testified that she reaffirmed that statement several other times prior to trial.

According to the testimony of Bill Blagg, who was employed as an Assistant District Attorney for Bexar County, he also interviewed Franklin in September of 1979 regarding her relationship to appellant. He testified that Franklin told him she had never represented herself as appellant's wife, although Bearden had, and that she described her relationship with appellant as a "working relationship, that of a prostitute and a pimp." Blagg further testified Franklin "was given every opportunity to say she was the wife of Silky [appellant] or there was a husband-wife relationship.

---

5. Art. 38.11, V.A.C.C.P., provided in pertinent part, at the time of trial:
 "Neither husband nor wife shall, in any case, testify as to communications made by one to the other while married.... The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution...."

6. Franklin described the "vows" as follows:
 "Q. Now, what do you mean he made vows to you, what did he tell you?

 "A. That he wanted me to be his wife.
 "Q. What did you tell him about that?
 "A. I just looked at him and said, 'Well'.
 &ast; &ast; &ast; &ast; &ast; &ast;
 "Q. Did he tell you anything further at that time?
 "A. Yes. He said he wanted me to be his wife and that to do as he—you know—to share responsibilities and do as, you know, he tells me to.
 "Q. And to do as he told you to do?
 "A. Yes."

She never indicated it nor did I see any evidence of it when I looked for it."

The record further reflects that while the incarcerated appellant was awaiting extradition for the instant offense, he signed two "Applications for Representation by Public Defender" before an Oklahoma judge "under penalty of perjury," wherein he swore he was single. Those applications were executed on April 26, 1979, and June 27, 1980. Appellant's explanations for these two "perjured" statements was that each time there was a woman present (different each time) who he wanted "to catch." He also testified that "[r]umors had it that three or four statements were against me and at the time I didn't want to claim nobody, so I lied. I lied. I sure did."

Appellant's testimony on this issue was full of inconsistencies and self-serving statements. When questioned about how many women he had represented as his wife over the years, his response was "[i]t depends on the circumstances and the situation. * * * Man, I know too many women. I know too many. I can't keep up with names, dates, all that, man." Although appellant testified, contrary to Franklin, that the marriage was not "secret" and that he, at some point, had told relatives and "numerous people" about the marriage, not one shred of documentary evidence or other testimony was introduced to support that claim. In fact, all the evidence, including the testimony of Franklin, directly contradicted that claim. It could be inferred from the record that appellant's first open claim to the common-law marriage came after the realization that Franklin was going to be, in the words of appellant in his brief, the "State's most effective witness against the defendant."

 Since the alleged marriage occurred in Oklahoma, the claim must be tested according to the substantive laws of that state which were introduced at trial by the appellant and considered by the trial judge in making his decision. *McArthur v. Hall*, 169 S.W.2d 724 (Tex.Civ.App.—Fort Worth 1943). When considering the procedural rules applicable in the instant case, however, we must refer to the laws of the forum. Nevertheless, we note that in both Oklahoma and Texas, the burden is on the proponent of a common-law marriage to prove the same,. by clear and convincing evidence in Oklahoma and by the preponderance of the evidence in Texas. *Maxfield v. Maxfield*, 258 P.2d 915 (Okl.1953); *In re Estate of Stinchcomb*, 674 P.2d 26 (Okl.1983, on rehearing); *Faglie v. Williams*, 569 S.W.2d 557 (Tex.Civ.App.— Austin 1978). We find the appellant failed to meet his burden.

 A claim of common-law marriage in circumstances such as this must be closely scrutinized by the courts, and the agreement of marriage should be specific on both sides. *Hightower v. State*, 629 S.W.2d 920 (Tex.Cr.App.1981); *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978), *cert. denied*, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979); *Chatman v. State*, 513 S.W.2d 854 (Tex.Cr.App.1974); *Krzesinski v. State*, 169 Tex.Cr.R. 178, 333 S.W.2d 149 (App.1960); *Welch v. State*, 207 S.W.2d 627 (Tex.Cr.App.1948).

The Oklahoma Supreme Court in *Stinchcomb*, supra, summarized the requisite elements of a common-law marriage in Oklahoma as follows:

"A party asserting a common law marriage must prove the following elements: an actual and mutual agreement between the spouses to be husband and wife; a permanent relationship; an exclusive relationship, proved by cohabitation as man and wife; and the parties to the marriage must hold themselves out publicly as husband and wife." *Id.* at 28–29.

The Court earlier held:

"In this jurisdiction it is the well-established rule that a consensual or so-called common-law marriage is a status to which a mutual consent is essential, consent being the threshold by which the status is reached but *which status is not attained until there has been a holding out by the parties of themselves as husband and wife and a public assumption*

**74**

*of the relation."* [7] *In re Trope's Estate,* 190 Okl. 453, 124 P.2d 733, 736 (1942).

The evidence elicited relative to this issue, as summarized above, clearly reflects that the appellant failed to prove, as a matter of law, all of the elements required by Oklahoma to establish a common-law marriage. We have serious reservations as to whether the testimony adduced raises even one of the requisite elements.

The appellant's motives for attempting to raise the issue at the time of trial are quite clear. His testimony, however, and that of Franklin, failed to establish that there was an actual and *mutual* agreement; or that his intent was to enter into a *permanent* and *exclusive* relationship, see *Marshall v. State,* 537 P.2d 423 (Okl.Cr.App.1975); or that the cohabitation of the two was not "irregular, limited or partial," *In re Miller's Estate,* 182 Okl. 534, 78 P.2d 819 (1938); see also *Quinton v. Webb,* 207 Okl. 133, 248 P.2d 586 (1952); *Richard v. Richard,* 172 Okl. 397, 45 P.2d 101 (1935); or, most certainly, that either of them openly held themselves out as husband and wife, see *Marshall v. State,* 537 P.2d 423 (Okl. Cr.App.1975); *Richard,* supra.

We can only conclude that there was insufficient evidence to establish that any marriage "had in fact been agreed to, consummated and adhered to" during the short time appellant and Franklin resided under the same roof. *In re Phifer's Estate,* 629 P.2d 808, 809 (Okl.App.—Div. No. 2 1981). We agree with the Oklahoma Supreme Court's ultimate holding in *Miller's Estate,* supra at 828, that the appellant's "subsequent actions, heretofore related, were so inconsistent with the idea of a marriage relationship that [his] testimony regarding the same became inherently improbable and was therefore properly disregarded by the court."

Furthermore, in *Hightower,* supra, we held:

"The existence of a common-law marriage is an issue of fact to be determined by the trier of the fact. *Warren v. Kyle,* 565 S.W.2d 313 (Tex.Civ.App.—Austin 1978, no writ). We find that appellant's failure to complain that the issue of a common-law marriage was not submitted to the jury, or to request that it be submitted, waived the error he now seeks to present." *Id.* at 924.

In the instant case, as in *Hightower,* the issue of the common-law marriage was not established as a matter of law and we can find no request from the appellant that the issue be submitted to the jury. No such issue was submitted. The error is waived.

Appellant's first ground of error is overruled.

In his second ground of error appellant contends that the trial court erred in permitting Mark Stanley Seiver to testify against the defendant where Seiver's knowledge of the case came to him "by virtue of his status as the defendant's legal advisor, in violation of the common law attorney-client privilege."

Seiver testified that he met the appellant while both were incarcerated in the Denver County Jail in Colorado. The appellant dismissed the public defender who was representing him and enlisted Seiver's assistance in contesting his extradition to Texas for the instant offense inasmuch as Seiver was fighting his own extradition to California and had assisted other inmates in similar proceedings. Seiver was not and had never been licensed to practice law, he had never attended law school, and he had only a pre-law undergraduate degree. Seiver testified he told appellant he was studying law in college and appellant knew he did not have "a bar card" and was not licensed to practice law. During the course of his relationship with Seiver, appellant confessed to the instant offense and revealed many details of the murder. Seiver testified that the incriminating statements were not necessary for the preparation of the extradition documents. These incriminating statements were admitted at trial over the appellant's objection that the statements were subject to a common-law attorney-client privilege.

**7.** All emphasis throughout this opinion is supplied by the author unless otherwise noted.

The appellant does not argue that he believed the witness was a licensed attorney and was misled to his detriment. Instead, he contends that Seiver was acting as his "legal advisor" and as such is entitled to the same privileges as any licensed attorney. His authority for this argument is apparently premised both on his interpretation of the common-law attorney-client privilege and on *Farretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), which held that an individual has a constitutional right to defend himself in a criminal proceeding.

Article 38.10, V.A.C.C.P., specifically provided at the time of trial that "an *attorney at law* shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship." Article 38.10 further provided that *all* persons who are not otherwise explicitly enumerated in the Code are competent to testify, "whatever may be the relationship between the defendant and witness...." [8]

Although the courts in Texas have extended this privilege to "persons who are the media of communication" [9] between the attorney and the client, we are unable to discover any authority or rationale to justify the appellant's request that we further extend the privilege to include communications between a defendant and anyone who may take it upon himself to give legal advice to that defendant. The ramifications of such a holding would be beyond calculation.

Moreover, such a result would actually be contrary to the original purpose of the common-law privilege which was to assure that since a layman should "have recourse to the assistance of *professional* lawyers ... he should be able to place unrestricted and unbounded confidence in the *professional* agent." 8 Wigmore, Evidence, § 2291, pp. 546–547, (McNaughton rev. 1961), quoting from *Anderson v. Bank*, 2 Ch.D. 644, 649 (1876). As was explained in *Wigmore*, supra:

"There is no ground for encouraging the relation of client and legal adviser except when the adviser is one who has been formally *admitted to the office of attorney or counselor* as duly qualified to give legal advice.

That the person consulted is in fact practicing, without formal sanction of the court, is certainly not sufficient.... According to the proposed Uniform Rules of Evidence, a 'lawyer,' for purposes of the privilege, is any 'person authorized ... to practice law in any state or nation the law of which recognizes a privilege against disclosure of confidential communications between client and lawyer.'

Finally, a mere *student at law*, aspiring to future entrance to the profession, is without the privilege, however much legal skill he may possess in comparison with some of those who are within it." (emphasis in original) *Wigmore*, supra at 580–581.

We are also unconvinced by the appellant's argument that by permitting self-representation in *Farretta*, supra, the Supreme Court also authorized the extension of the attorney-client privilege to include "jailhouse lawyers." It would seem that a clearer basis for appellant's proposition would be found in *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), wherein the Supreme Court held that an inmate's right to access to the courts, founded in the Due Process Clause, prohibits prison regulations which bar inmates from furnishing legal assistance to each other "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief." *Id.*, 393 U.S. at 490, 89 S.Ct. at 751. The Supreme Court further held that the prisons could place "reasonable restrictions and restraints" upon the inmates in the exercise of this right. *Id.*, 393 U.S. at 490, 89 S.Ct. at 751.

We could find no specific authority, however, and appellant fails to refer us to any,

---

8. The attorney-client privilege was recodified in the Texas Rules of Criminal Evidence Rule 503.

9. *Burnett v. State*, 642 S.W.2d 765 (Tex.Cr.App. 1982).

to support the proposition that permitting one inmate to assist another in legal matters automatically elevates that inmate to the role of an attorney at law with all the privileges, responsibilities, and restrictions which accompany a formal license to practice law. We do note, however, that the Louisiana Supreme Court in *State v. Spell*, 399 So.2d 551 (La.1981), specifically held contrary to appellant's contention in a fact situation similar to and perhaps even more compelling than appellant's. In *Spell*, the defendant contended his statements made to a fellow inmate who was *assigned* to the law library at the prison "to help other prisoners with their legal problems by writing letters, preparing pleadings, and otherwise giving them whatever advice he could" but who was not an attorney and who did not hold himself out as a lawyer were privileged communications. The court held, even under those facts, communications between the two inmates were not subject to the attorney-client privilege.

In light of the foregoing, appellant's second ground of error is overruled.

In his third ground of error, appellant contends that the trial court erred in permitting State's witness Robert Rast, a psychologist, "to testify at the punishment stage of the trial where the witness was a surprise witness and although extensive discovery had been made prior to trial the State had never disclosed that particular witness."

The record reflects that pursuant to appellant's motion, the trial court ordered the State to make known to the defense the names and addresses of its proposed witnesses. The list was furnished to the appellant at the ordered time and three psychiatrists were included on the list. Rast's name was not included. Appellant's attorney conducted substantial trial preparations in order to effectively cross-examine the three psychiatric witnesses listed. None of those three witnesses were called by the State. Instead, at the punishment phase of the trial, the State called Rast. Appellant objected to the testimony of Rast on the grounds that the witness was a surprise and the defense was not prepared

to meet, rebut, or explain the testimony of the witness. The record further reflects that Rast was not contacted by the State regarding testifying in this case until the day before his testimony. Both the prosecutor and the trial judge stated that in a conference conducted on the same day as Rast was contacted, the prosecutor had informed appellant's counsel that Rast would be called as the State's final witness and the three other psychiatric witnesses would not be called. Appellant's attorney stated that he did not recall that Rast's name had been specifically mentioned at the conference.

In a hearing held outside the presence of the jury, Rast testified that he was a clinical psychologist who had never examined appellant nor conferred with him. The following exchange then occurred:

"THE COURT: Mr. Cazier [appellant's attorney], I find it difficult to see how the Defendant would be harmed by not having been advised that this particular person is going to testify. You are not being deprived of any information that the State had previously that hasn't unfolded before all of us in the last few days of this trial with the only exception of this doctor's qualifications.

"I'll let the State establish his qualifications to give an expert opinion now, and then *if you feel there is something about that that you need additional time to prepare for, I'll consider giving you that time.*

"MR. CAZIER: *Okay.* Let me say for the record ... I have obviously no preparation whatsoever to respond to this witness' testimony? [sic]"

After examination of Rast by both the State and appellant's attorney, the Court further stated:

"I'm trying to be just as fair as I can with you.

"Can you assist me in telling the areas of cross-examination that you would like to explore that somehow you are inhibited by not knowing this was the man that is going to be on the stand? I know you were loaded for bear on the other two doctors."

"MR. CAZIER: Let me ask this witness a couple more questions and *I might.*

"THE COURT: That may be why the State is not calling them. They can do that."

After a few more questions by appellant's counsel, the court held that the witness would be permitted to testify. Appellant's attorney then stated, "We do object for the record." No request was made by the appellant for any continuance, nor did the appellant state in what way he was harmed by the notice failure. Before the jury, Rast testified as to his qualifications and then in response to a hypothetical question propounded by the State testified that the person described was a sociopath and would probably continue to commit future acts of violence. Rast was closely cross-examined by appellant's attorney about any possible bias and about his knowledge of current authoritative psychiatric literature. During Rast's testimony, appellant further objected because the hypothetical question recited items that were not in evidence and because the opinion of the psychologist as to future dangerousness was not admissible in that the opinion invaded the province of the jury and called for speculation on the part of the witness. Both objections were overruled.

■ The names of witnesses should be disclosed, upon proper motion by the appellant, if they will be used by the State at any stage in the trial. *Hightower v. State,* 629 S.W.2d 920 (Tex.Cr.App.1981); *Young v. State,* 547 S.W.2d 23 (Tex.Cr. App.1977). The standard of review when a witness is permitted to testify who was not included on the witness list is whether the trial court abused its discretion in allowing such witness to testify. *Pinkerton v. State,* 660 S.W.2d 58 (Tex.Cr.App.1983); *Hightower,* supra; *Lincoln v. State,* 508 S.W.2d 635 (Tex.Cr.App.1974). See also *Bridge v. State,* 726 S.W.2d 558 (Tex.Cr. App.1986).

In *Hightower,* supra, this Court explained the following:

"Among the factors which will be considered by this Court in determining whether there has been an abuse of discretion is a showing of bad faith on the part of the prosecutor in failing to disclose ahead of time the name of the witness. See *Clay v. State,* 505 S.W.2d 882 (Tex.Cr.App.). [See also *Pinkerton,* supra; *Lincoln,* supra.] Another such factor is whether the defendant can reasonably anticipate that the witness would testify although his or her name was not included within the witness list. See *Smith v. State,* 540 S.W.2d 693 (Tex.Cr. App.)." [citations in brackets added]. *Hightower,* supra at 925.

■ In the instant cause, it is undisputed that Rast's name was not on the witness list. Appellant has not shown, however, that the State's failure to include the name was in bad faith. Both the prosecutor and the trial court stated that appellant's attorney was notified of Rast's testimony on the same day that Rast was initially contacted by the State. Rast's testimony failed to show that he was particularly biased towards one side or the other. He testified that *he had never before testified for the prosecution in a criminal prosecution* and was not familiar with anyone on the District Attorney's staff. Furthermore, we note that the trial court did all that it could to insure appellant was not unfairly harmed by Rast's testimony by offering to consider a postponement so that appellant could prepare for the testimony, an offer upon which appellant failed to act. Appellant failed to adequately explain to either the trial court or this Court in what way the substitution of Rast's testimony regarding the hypothetical restricted his ability to cross-examine him. See *Toler v. State,* 546 S.W.2d 290 (Tex.Cr.App.1977).

Appellant, in the same ground of error, asserts that "prosecutors" have seized on the hypothetical question method of presenting psychiatric testimony at the sentencing hearing in a capital murder case in order to avoid the protections afforded capital murder defendants by *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). He contends that, if this is to be permitted, the defense should at least be

given fair notice of the witnesses the State will use.

As the discussion, supra, shows, we do not find that the appellant was denied fair notice under the particular facts of this case. Furthermore, *Estelle v. Smith*, supra, held that the defendant's Fifth Amendment privilege against compelled self-incrimination was violated in that he was not advised prior to his pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a capital sentencing procedure, as subsequently occurred. We are unconvinced that the holding in *Estelle v. Smith* has any applicability where there is no Fifth Amendment involvement. Moreover, since appellant filed his brief in this case, the Supreme Court in *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), specifically rejected the argument that the use of the hypothetical question as to future dangerousness in a death penalty case such as this requires more stringent rules of evidence than are ordinarily applied. *Id.*, 103 S.Ct. at 3400.

In light of all of the above, we cannot find that the trial court abused its discretion in allowing Rast to testify. *Pinkerton*, supra; *Hightower*, supra.

Accordingly, appellant's third ground of error is overruled.

In his fourth ground of error, appellant contends the trial court erred in refusing to permit appellant's counsel to cross-examine and thereby impeach Rhonda Bearden concerning the underlying facts and details of a felony committed by her. In his fifth ground of error, appellant contends the trial court erred in refusing to issue out-of-state compulsory process for two of the victims of the extraneous offenses committed by Bearden in order to offer evidence concerning the underlying details of the offenses. Appellant and the State in their respective briefs discuss both grounds of error together. We will do the same.

Bearden admitted on direct examination that she was certified as an adult in the juvenile court in Colorado and convicted of second degree kidnapping and violent crime, offenses which occurred in Colorado shortly after the instant offense. During cross-examination, Bearden initially denied that she was promised anything or stood to gain anything by her testimony against appellant. Under further questioning, she admitted she was serving a ten to twelve year prison term and in exchange for her testimony in the instant trial her sentence was to be reduced to three years. Nevertheless, she continued to assert that the sentence reduction was not her reason for testifying. Appellant's counsel further elicited from Bearden that she was originally charged in Colorado with the offenses of first degree kidnapping, violent crime, aggravated robbery, criminal conspiracy, second degree assault, aggravated motor vehicle theft, first degree assault, and conspiracy to commit aggravated robbery.

Appellant's counsel then announced to the court that he proposed "to go into the underlying transactions for which these criminal charges arose." The court recessed the jury and appellant's counsel questioned Bearden outside the presence of the jury.

During this hearing, Bearden testified that she and Franklin were involved in two criminal transactions, occurring on consecutive days in two separate Colorado towns. On the first day, she and Franklin entered the home of an elderly couple after telling them they wanted to use the telephone. They then left the house and returned a few minutes later on the pretext of again using the telephone. Upon once more gaining entry to the home, Bearden handed Franklin a gun and the two robbed the couple, obtaining less than thirty dollars. During the course of the robbery, Franklin put the gun against the chest of the female victim and demanded that she give them a ten dollar bill that the victim was reluctant to relinquish. Franklin and Bearden then tied the hands and feet of the couple and left.

The next day, the pair, along with a third woman, met a man at a bar who was intoxicated and who was carrying a lot of money. The three women and the man left the bar together in the man's car. Bearden later

hit the man on the back of the head with a gun, apparently while he was engaged in sexual intercourse with Franklin in the back seat of the car. Bearden threatened to kill the still-conscious victim if he did not give them his money. When he told the women he had left his money at the bar, the group returned to the bar where he attempted to grab Bearden. Bearden fired a shot into the ceiling and escaped with Franklin in the victim's car. They were arrested shortly thereafter.

Appellant's counsel offered the above-described testimony on the theory that, "[i]t goes to the credibility of the witness. It goes to her motive to testify and it goes to a similarity between the two transactions, specifically the use of a gun, the tying of the hands and feet of the elderly couple, threat of death." The trial court found the testimony to be inadmissible.

The appellant also requested that two of the Colorado victims be subpoenaed from out-of-state to testify as to the facts of the prior convictions "for purposes of showing the credibility of the State's witness." The trial court denied the request, holding that the testimony would lack materiality. On appeal, appellant cites only *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), as authority for his contentions, claiming that the trial court's actions deprived him of his Sixth Amendment right to confrontation and compulsory process.

In *Davis*, supra, the defense attempted to impeach a crucial witness for the prosecution by showing that he was on juvenile probation at the time he was assisting the police. The defense claimed that fear or concern of possible jeopardy to his probation could have influenced the witness' identification of the defendant and his testimony at trial. The trial court, however, issued a protective order preventing any reference to the witness' juvenile record. Although defense counsel was permitted to ask the witness general questions concerning *whether* the witness might be biased, he was not permitted to argue the specific reason *why* the witness might have been biased or impartial.

The Supreme Court found that the trial court's actions in restricting the cross-examination of the witness as to possible biases prevented the defense from presenting evidence which could have seriously affected the credibility of this crucial witness. While the Supreme Court recognized that the State had a legitimate interest in protecting the anonymity of juvenile offenders, the Court held the right of confrontation *"in this setting"* was paramount. 415 U.S. at 319, 94 S.Ct. at 1112.

Thus *Davis'* ultimate holding was that a defendant must be allowed, within certain limits, the freedom to expose a particular witness' possible biases and prejudices against the defendant. In Texas, although at the time of trial Art. 38.29, V.A.C.C.P., provided that only final convictions or probations wherein the period of probation had not expired may be used for purposes of *general* impeachment, in accord with the holding in *Davis*, supra, the accused is given great latitude in showing any fact which would tend to establish ill feeling, bias, or motive for fabrication on the part of any witness testifying against the accused. *Harris v. State*, 642 S.W.2d 471 (Tex.Cr.App.1982); *Bates v. State*, 587 S.W.2d 121 (Tex.Cr.App.1979); *Carrillo v. State*, 591 S.W.2d 876 (Tex.Cr.App.1979); *Simmons v. State*, 548 S.W.2d 386 (Tex.Cr.App.1977); *Evans v. State*, 519 S.W.2d 868 (Tex.Cr.App.1975); *Burkhalter v. State*, 493 S.W.2d 214 (Tex.Cr.App.1973).

█ We note that in the instant cause appellant's counsel was permitted to establish such a bias or motive. The jury learned that Bearden had been originally charged with eight offenses, that she had been convicted of second degree kidnapping and violent crime, *and that her ten to twelve year sentences would be reduced to three years after her testimony in the instant cause.* The danger perceived and denounced in *Davis*, supra, did not arise here. The appellant was able to fully explore the possible prejudices and biases of Bearden in an attempt to affect her credibility. The *details* of the offenses would not have been probative of bias or motive to testify falsely. See *Murphy v. State*,

587 S.W.2d 718 (Tex.Cr.App.1979); *Driehs v. State*, 164 Tex.Cr.R. 455, 301 S.W.2d 123 (App.1957).

The appellant also contended, however, that the excluded testimony was admissible on the basis that it was "similar." By this we assume he meant that the offenses committed in Colorado were similar in means of commission to the instant offense and that the introduction of the details of the extraneous offenses could have shown that it was possible that the witnesses and not the appellant committed the instant offense. During his closing statement, appellant's counsel ably argued that scenario.

Ordinarily, evidence of offenses committed by parties other than the defendant is inadmissible. *Franklin v. State*, 606 S.W.2d 818 (Tex.Cr.App.1978); *Florio v. State*, 532 S.W.2d 614, 618 (Tex. Cr.App.1976); *Loy v. State*, 502 S.W.2d 123 (Tex.Cr.App.1973); *Ferrell v. State*, 429 S.W.2d 901 (Tex.Cr.App.1968); *Daltwas v. State*, 375 S.W.2d 732 (Tex.Cr.App.1964); *Burke v. State*, 642 S.W.2d 197 (Tex.App. —Houston [14th] 1982).[10] If the evidence proferred by the defendant is neither inconsistent with nor precludes his guilt, the evidence is not probative of any material issue and is properly excluded. *Franklin*, supra; *Florio*, supra; *Loy*, supra; *Dickson v. State*, 492 S.W.2d 267 (Tex.Cr.App.1973).

In the instant case, the details of the offenses committed by Bearden and Franklin as shown by the appellant's questioning of Bearden outside the presence of the jury, were neither probative of nor inconsistent with the guilt of appellant in the instant cause. The jury was aware of the violent offenses with which Bearden was charged and the convictions which resulted. Appellant's bill of exception failed to demonstrate any connection in similarity or relevance to the instant case, especially when one considers the direct evidence of appellant's guilt, including his confession to Seiver, a person not directly related to this offense. See *Williams v. State*, 662 S.W.2d 344 (Tex.Cr.App.1983). Given its lack of connection to the offense charged, the trial court did not err in excluding the evidence of the details of the extraneous offenses.

Grounds of error four and five are overruled.

In his sixth ground of error, the appellant contends that the trial court incorrectly denied the indigent appellant "the effective assistance of counsel and compulsory process by not allowing sufficient time and funds to permit defense counsel to obtain the depositions of witnesses in Mexico."

The record reflects that on July 29, 1981, appellant filed a motion to take the depositions of the three women who were residents and citizens of Mexico City, Mexico, and who were in room 494 of the Holiday Inn at the time of the murders.

On July 30, 1981, the trial court heard appellant's motion and ordered the taking of written interrogatories of the three witnesses by a United States diplomatic or consular officer in Mexico City. The trial court ordered appellant's counsel to pre-

10. In *Franklin*, supra, we held that the trial court properly excluded testimony that a man the defendant claimed had borrowed his car on the night in question had later been arrested and charged with a similar offense; *Florio*, supra, held that it was proper to exclude evidence that 19 days prior to the offense someone other than the defendant attempted to gain entrance to an apartment in the same manner in which the defendant was charged with entering the complainant's apartment; in *Ferrell*, supra, we held the trial court did not err in refusing to allow the defendant to prove that another robbery was committed while the defendant "was in jail by robbers using the same type of disguise, weapon and modus operandi"; in *Loy*, supra, and *Daltwas*, supra, we held the trial court properly refused to allow the defendants to introduce evidence of the convictions of the defendants' cohabitants for possession of the same substances as involved in the current causes; and in *Burke*, supra, it was held that the proffered testimony of a police officer that another man who resembled the composite picture of the rapist in the instant case was about to go to trial for a similar abduction of a girl from the same general area was properly excluded.

Compare *Jackson v. State*, 551 S.W.2d 351 (Tex.Cr.App.1977); and *Holt v. U.S.*, 342 F.2d 163 (5th Cir.1965), wherein the defense was misidentification and it was held to be error to forbid introduction of testimony showing that the defendant had actually *previously been misidentified* as a particular person who was known to have committed similar offenses as the ones at bar.

pare his interrogatories and whatever orders were necessary "to bring this about." The commission to take the depositions, apparently prepared by appellant, was signed by the court on August 4, 1981, and forwarded to the United States Embassy in Mexico.

On August 31, 1981, the day the case was set for trial on the merits, appellant filed and urged a motion for continuance asserting, among other things (including that he had not yet been accorded a pretrial hearing on his motion to suppress), that he had been unable to obtain the depositions of the women because the embassy required a $100.00 fee and a court reporter and an interpreter from the United States. The trial court, necessarily aggrieved at this complaint, reminded appellant's counsel that he had agreed to the written interrogatories with the understanding that counsel would work out the details. The court then asked counsel if it was not possible for the witnesses to simply write out their answers before the officer without the necessity of having a court reporter transcribe the answers. Counsel responded that that possibility had not been discussed. The court then instructed counsel that if necessary the official court interpreter could translate the interrogatories into Spanish and the handwritten answers into English. Appellant's counsel stated, however, that all of the witnesses spoke English. The court then went into other matters, including the motion to suppress, without objection from the appellant.

Although the record does not affirmatively reflect the trial court's authorizing the fee payment, appellant in his brief admits the same. The record does contain a copy of a letter, dated September 2, 1981, and filed in the trial court on September 3, 1981, from appellant's counsel to officials at the embassy requesting that the depositions be taken by permitting the witnesses to give their answers in writing in English. The letter also enclosed a $100.00 check to the embassy for its fee. On September 2, 1981, after hearing testimony on the motion to suppress, the trial court finally overruled appellant's motion for continuance after counsel stated "We have no further

argument on that motion...." Voir dire examination of the prospective witnesses began on that date. The State began presenting its evidence on September 10, 1981, and rested on September 15, 1981. The defense rested on the same day without presenting evidence.

The record further shows that the $100.00 check and the unanswered interrogatories were returned to appellant's counsel by the embassy pursuant to a request from counsel dated September 21, 1981.

The trial court has wide discretion in either granting or denying applications to take depositions. Art. 39.02, V.A.C.C.P.; *Aguilar v. State*, 468 S.W.2d 75 (Tex.Cr. App.1971); *Beard v. State*, 481 S.W.2d 875 (Tex.Cr.App.1972); *McKinney v. State*, 491 S.W.2d 404 (Tex.Cr.App.1973); *James v. State*, 546 S.W.2d 306 (Tex.Cr.App.1977).

In this instance, the trial court authorized the taking of written depositions by a diplomatic or consular officer in Mexico City in accordance with Arts. 39.06 and 39.09, V.A.C.C.P. Appellant complains that "the bottom line is that the deposition testimony was never obtained because the court would not authorize the necessary expense." We interpret "the bottom line," however, to be that appellant failed to promptly follow through with the trial court's instructions to pursue the matter.

■■ Although appellant does not directly contest the denial of the motion for continuance, he contends that the trial court's failure to grant him sufficient time to obtain the depositions amounted to a denial of the depositions. We note, however, that trial counsel was appointed on March 10, 1981; trial counsel was notified by mail on May 29, 1981, that the trial on the merits was to begin on August 31, 1981; and yet the motion for depositions was not filed until July 29, 1981. The trial court heard and granted the motion promptly. The record reflects the trial court was not notified of any problems with the depositions *until the day of trial.* Even then, he did not refuse to permit the depositions. He authorized the payment of

the fee to the embassy and suggested reasonable solutions to the other problems appellant's counsel raised with regard to the depositions. Appellant's counsel neither raised objections to the trial court's suggestions nor contended that the depositions were not achievable by the alternative means suggested by the trial court. At no time did the trial court refuse to permit the depositions.

■ Appellant's argument that the trial court denied him the effective assistance of counsel and compulsory process by not providing sufficient time and funds for a court reporter and an interpreter to fly to Mexico City to obtain the depositions of the witnesses is without merit. Appellant had placed himself in the position of trying to obtain, in one month's time, depositions from witnesses outside the country. He then did not diligently pursue the matter to a satisfactory conclusion.

In addition, we find that the record does not reflect that the trial court specifically denied a request from appellant for funds to obtain the depositions. The trial court authorized the payment of the necessary fee and offered a reasonable and frugal method of obtaining the depositions. See *Aguilar,* supra; *Langston v. State,* 416 S.W.2d 821 (Tex.Cr.App.1967). See also *Quin v. State,* 608 S.W.2d 937 (Tex.Cr.App. 1980); *Cadd v. State,* 587 S.W.2d 736 (Tex. Cr.App.1979).

■ Furthermore, under Art. 26.05, V.A.C.C.P., counsel is entitled to investigative expenses only *after* they are incurred; even then, reimbursement is discretionary with the court, and refusal to pay expenses before they are incurred is not an abuse of discretion. *Wallace v. State,* 618 S.W.2d 67 (Tex.Cr.App.1981).

Appellant's sixth ground of error is overruled.

In his seventh ground of error, appellant contends the trial court erred in permitting the State to introduce into evidence during the punishment phase, over appellant's objections, State's Exhibit No. 51, which was a federal judgment and commitment dated

March 19, 1973, showing that appellant pled guilty to "possession of stolen mail containing a U.S. Treasury check" and was sentenced under the Federal Youth Corrections Act, 18 U.S.C. § 5010(b). Appellant contends that the exhibit was inadmissible because the Federal Youth Corrections Act provides for automatic expungement of the conviction upon completion of the sentence. See 18 U.S.C. §§ 5010(b), 5017, 5021; *United States v. Arrington,* 618 F.2d 1119 (5th Cir.1980).

The record reflects, however, that Federal Probation and Parole Officer Robert Mitchell testified without objection that he supervised appellant after his release on parole for the possession of stolen mail conviction. Mitchell further testified he classified appellant during his parole as a "high risk case," and, although he had the authority, he did not recommend appellant be issued a "certificate of expungement" prior to the time appellant's sentence expired. Instead, appellant's parole was automatically terminated at the expiration of his sentence on March 15, 1979.[11]

■ Appellant's failure to object to the testimony of Mitchell waived any error as to the introduction of State's Exhibit No. 51. *Boles v. State,* 598 S.W.2d 274 (Tex.Cr. App.1980). Moreover, this Court has consistently held that proof of even unadjudicated extraneous offenses at the punishment phase of a capital murder case is admissible pursuant to the authority of Art. 37.071(a), V.A.C.C.P. *Smith v. State,* 683 S.W.2d 393 (Tex.Cr.App.1984) (reh'g den. Jan. 30, 1985); *Rumbaugh v. State,* 629 S.W.2d 747 (Tex.Cr.App.1982); *Williams v. State,* 622 S.W.2d 116 (Tex.Cr. App.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Crawford v. State,* 617 S.W.2d 925 (Tex.Cr.App. 1980), *cert. denied* 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431 (1981), *reh. denied,* 453 U.S. 923, 101 S.Ct. 3160, 69 L.Ed.2d 1005 (1981); *Milton v. State,* 599 S.W.2d 824 (Tex.Cr.App.1980), *reh. denied* 620 S.W.2d 115 (Tex.Cr.App.1980), *cert. denied,* 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d

11. As noted earlier, the instant offense occurred on March 31, 1979.

400 (1981), *reh. denied,* 453 U.S. 923, 101 S.Ct. 3160, 69 L.Ed.2d 1006 (1981); *Brooks v. State,* 599 S.W.2d 312 (Tex.Cr.App.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981), *reh. denied,* 453 U.S. 950, 102 S.Ct. 25, 69 L.Ed.2d 1036 (1981); *Quinones v. State,* 592 S.W.2d 933 (Tex.Cr. App.1980), *cert. denied,* 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980), *reh. denied,* 449 U.S. 1027, 101 S.Ct. 600, 66 L.Ed. 2d 490 (1980); *Green v. State,* 587 S.W.2d 167 (Tex.Cr.App.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981), *reh. denied,* 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1022 (1981); *Hammett v. State,* 578 S.W.2d 699 (Tex.Cr.App.1979), *pet. dismissed,* 448 U.S. 725, 100 S.Ct. 2905, 65 L.Ed.2d 1086 (1980).

Appellant's seventh ground of error is overruled.

In his eighth and ninth grounds of error, appellant complains of the indictment and court's charge. He contends that the trial court erred in overruling his motion to quash the indictment and in overruling his objections to the court's charge at the guilt-innocence phase of the trial since both the indictment and charge included the culpable mental state "knowingly." He contends that the insertion of the culpable mental state "knowingly" in the indictment authorizes a conviction for felony murder under V.T.C.A. Penal Code, § 19.02(a)(3), instead of capital murder under V.T.C.A. Penal Code, § 19.03(a)(2), and as such is duplicitous and fails to give him precise notice of the charge against him. He further argues that the charge of the court is ambiguous in that it authorizes the jury to convict upon a finding of a culpable mental state less than that permitted by statute.[12]

Appellant's indictment, in pertinent part, alleged that the appellant:

**12.** See V.T.C.A. Penal Code, § 6.02(d).

**13.** The appellant does not complain of the discrepancy between the indictment's "intentionally *and* knowingly" and the "intentionally *or* knowingly" language in the court's charge to the jury. We have held in the past that such does not constitute error. *Hammett,* supra. See also *Cowan v. State,* 562 S.W.2d 236 (Tex.Cr.App. 1978).

"did then and there intentionally *and* knowingly cause the death of an individual, namely: JOHN G. EBBERT, hereinafter called complainant, by SHOOTING THE SAID COMPLAINANT WITH A GUN, and the said defendant did then and there intentionally cause the death of the said complainant while in the course of committing and attempting to commit the offense of ROBBERY, AGAINST THE SAID COMPLAINANT...."

The court's charge to the jury stated in pertinent part:

"Now if you find from the evidence beyond a reasonable doubt that ... Miguel A. Richardson, did intentionally or knowingly cause the death of John G. Ebbert, by shooting the said John G. Ebbert with a gun, and the said Miguel A. Richardson, did then and there intentionally cause the death of the said John G. Ebbert while in the course of committing or attempting to commit robbery of John G. Ebbert, you will find the defendant guilty of capital murder."

Thus the portion of the charge that applies the law to the facts strictly followed the allegations in the indictment by authorizing the jury to convict if they found the defendant intentionally or [13] knowingly caused the death of the victim *and* intentionally caused the death while in the course of committing or attempting to commit the robbery of the victim.

Capital murder is committed when a person commits murder, V.T.C.A. Penal Code, § 19.02(a)(1), with at least one of the aggravating factors contained in the capital murder statute, V.T.C.A. Penal Code, § 19.03.[14] Combining the elements of the two statutes we find that capital murder

**14.** V.T.C.A. Penal Code, § 19.03, the capital murder statute, provides in pertinent part:

"(a) A person commits an offense if he commits murder as defined under Section 19.-02(a)(1) of this code and: ...

"(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson...."

under § 19.03(a)(2) is committed when a person intentionally or knowingly causes the death of an individual (murder under § 19.02(a) (1)) *and* intentionally commits the murder in the course of committing or attempting to commit robbery. That is precisely what the indictment and the court's charge to the jury authorized in the instant cause. We have in the past implicitly approved of similar indictments and charges. *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979), judgment vacated and case remanded on other grounds, 453 U.S. 902, 101 S.Ct. 3133, 69 L.Ed.2d 987 (1981), opinion on remand, 623 S.W.2d 650 (1981); *Hammett*, supra; *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *White v. State*, 543 S.W.2d 104 (Tex.Cr.App.1976), *cert. denied*, 430 U.S. 988, 97 S.Ct. 1689, 52 L.Ed.2d 384 (1977).

Article 21.02, V.A.C.C.P., provides that in an indictment, the offense must be set forth in plain and intelligible words. Further, Art. 21.11, V.A.C.C.P., provides an indictment

"shall be deemed sufficient which charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged."

In turn, the trial court's charge to the jury generally should correspond to the allegations in the indictment. *Jackson v. State*, 633 S.W.2d 897 (Tex.Cr.App.1982); *Booker v. State*, 523 S.W.2d 413 (Tex.Cr.App.1975).

The indictment in question literally followed the statute, was written in ordinary and concise language, and neither mislead appellant nor failed to give him fair notice of the offense charged. Moreover, we find that the indictment clearly alleges that appellant is being charged with capital murder under § 19.03(a)(2), and not felony murder under § 19.02(a)(3).

We also find that the court's charge, which properly required that the jury find that the appellant *intentionally*

caused the death while in the course of committing or attempting to commit robbery, properly tracked the indictment and the statute and was neither ambiguous nor did it permit the jury to convict the appellant upon a finding of a culpable mental state less than that required by statute.

Appellant's eighth and ninth grounds of error are overruled.

In his tenth ground of error, appellant contends the trial court erred in permitting the State to introduce into evidence certain items seized during a search of appellant's car by Colorado police officers pursuant to a search warrant issued by a Colorado magistrate. The items seized and introduced at trial were two wigs, a business card for "On the Top in High Fashion Modeling Agency," and an invoice for the purchase of business cards for the same modeling agency.

The State's apparent motive in introducing the invoice and business card was to prove that appellant was the man who was registered at the Holiday Inn at the time of the offenses under the alias of Michael Coleman and who stated on the hotel registration card that his firm was called "On the Top in High Fashion." The record reflects, however, that this fact was clearly established in the record by the testimony of the State's witnesses. All three of the women who were traveling with appellant testified appellant was staying at the Holiday Inn at the time of the murders; Bearden testified that appellant often used aliases and checked into the Holiday Inn on the date in question under the alias Michael Coleman; Seiver testified that appellant admitted being a registered guest, under the alias of Coleman, at the Holiday Inn at the time he killed the security officers; and, most significantly, *the desk clerk who registered appellant clearly identified appellant as the man who registered as Michael Coleman and who stated his company was called "On the Top in High Fashion."* That appellant was a registered guest at the Holiday Inn at the time of the offense was established beyond a reasonable doubt by evidence separate from that seized as a result of the Colorado search.

The two wigs were apparently offered by the State in an attempt to corroborate the testimony of Bearden and Franklin that appellant told them he had put on a wig on the night in question in order to disguise himself during his attempt at robbing the women in room 494. The record reflects, however, that appellant also told Seiver that he oftentimes wore a wig as a disguise and that he was wearing one at the time of the shooting. Accordingly, testimony other than that obtained as a result of the search established that fact. We also note that whether or not appellant was wearing a wig at the time of the offense, under the facts of this case, is of little moment to the identity of appellant as the person who murdered the two guards.

Without reaching the merits of appellant's claims regarding the legality of the search and seizure of the items, we find that the admission of the items was cumulative and harmless beyond a reasonable doubt. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Nickerson v. State*, 660 S.W.2d 825 (Tex.Cr.App. 1983); *Wood v. State*, 573 S.W.2d 207 (Tex. Cr.App.1978).

Appellant's tenth ground of error is overruled.

Appellant's eleventh ground of error, concerning voir dire, was disposed of at the beginning of this opinion and was overruled.

In his twelfth and final ground of error, appellant contends that the trial court erred in refusing his requested charges at the punishment phase of the trial regarding mitigation. This Court has consistently overruled similar grounds of error made by other defendants. *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.1984); *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980), cert. denied, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980), reh. denied, 449 U.S. 1027, 101 S.Ct. 600, 66 L.Ed.2d 490 (1980). We decline to overrule same.[15]

Appellant's twelfth ground of error is overruled.

Appellant has also filed a pro se writ of habeas corpus which we deem a pro se brief. Although appellant is not entitled to hybrid representation, we have in the interest of justice examined same and find no error that should be considered in the interest of justice. *Rudd v. State*, 616 S.W.2d 623 (Tex.Cr.App.1981).

The judgment of the trial court is affirmed.

WHITE, J., not participating.

CLINTON, Judge, dissenting.

The treatment given to appellant's ground of error eleven is erroneous in two respects, in my view. First, the majority is wrong to dismiss appellant's complaint against the *sua sponte* nature of the trial court's action on the basis that such complaint does not comport with his trial objection. The majority would require appellant to articulate what was obvious to all present, indeed is obvious from the cold record, *viz:* that he was objecting to *the trial court's* exclusion of the venireman on the basis of Article 35.16(a)(10), V.A.C.C.P., when the full predicate for such exclusion had not been laid by either the trial court or the State. To hold that error was not preserved in this context is just pedantic, *Moore v. State*, 542 S.W.2d 664, 668 (Tex. Cr.App.1976) notwithstanding. See *Hernandez v. State*, 643 S.W.2d 397 (Tex.Cr. App.1983) (Teague, J., dissenting).

More disturbing, however, is the analysis by which the majority distinguishes *Grijalva v. State*, 614 S.W.2d 420 (Tex.Cr.App. 1981). After observing that it was in response to a challenge for cause from the State that the venireman in *Grijalva* had been erroneously excused, the majority concludes:

"The State in no way prompted the erroneous excusal nor did it have an opportunity to timely exercise a peremptory challenge against him. [footnote omitted.] In short, this venire member was never passed first to the State and then to the

---

**15.** Although the author of this opinion joined in the dissenting opinion in *Stewart,* supra, concerning this same issue, the rules of stare decisis

compel the above holding. *Johnson v. State,* 691 S.W.2d 619, (Tex.Cr.App.1984) (Clinton, J., concurring).

appellant for challenges according to the requirements of Art. 35.13, V.A.C.C.P. Thus, the 'corruption of the peremptory strike practice' that gave the state 'an unfair advantage,' so condemned in *Grijalva,* is absent from this case."

At p. 71, quoting *Bell v. State,* 724 S.W. 2d 780, at 796 (Tex.Cr.App.1986). With deference, this facile distinction does not withstand scrutiny.

In *Grijalva,* no less than in the instant case, opportunity for the orderly conduct of peremptory challenges by *both* sides was preempted by erroneous excusal of the venireman by the trial court. That here that excusal was *sua sponte* does not invalidate the rationale of *Grijalva.* Whether the venireman was excused in response to a State's challenge for cause or *sua sponte,* to call the erroneous excusal harmless on the basis that the State had remaining peremptories is effectively to afford the State an out of time peremptory challenge (or, as the majority labels it, "constructive use" of a remaining peremptory) to retroactively correct the error. Circumvention of the statutorily mandated order for the exercise of peremptory challenges in a capital case is just as manifest here as it was in *Grijalva.**

Finding no meaningful distinction between this case and *Grijalva,* I respectfully dissent.

TEAGUE and DUNCAN, JJ., join this opinion.

---

* In *Bell v. State,* supra, at 796, the Court elaborated upon its present rationale in similarly distinguishing *Grijalva,* thus:

"... *Grijalva* is founded on the notion that the State *caused* the improper excusal by issuing a challenge for cause, and is therefore penalized because of the advantages it would otherwise receive by holding a peremptory strike back. Where the trial judge, not the State, is solely responsible for the improper excusal, the justification for penalizing the State under *Grijalva* disappears."

I had not understood *Grijalva* to be "founded on the notion that the State *caused* the improper excusal," and should therefore be "penalized." I

should think that, inasmuch as it is said to thwart the dictates of Article 35.13, supra, by giving the State "the benefit of making its judgments with a perspective of the entire panel, a perspective which is not given the defendant[,]" 614 S.W.2d at 424, to allow retroactive application of remaining State peremptories to cure the otherwise reversible error of excusing a qualified venireman over objection would be equally disruptive whether the State "caused" the trial court to excuse the venireman or the court acted of its own volition. The point is not to penalize the State, but to avoid penalizing the defendant.