Michael W. EVANS, Appellant,

v.

The STATE of Texas, Appellee.

Michael W. MEYER, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 49464, 49465.

Court of Criminal Appeals of Texas.

Feb. 26, 1975.

Rehearing Denied April 2, 1975.

Charles D. Butts, San Antonio, for Evans.

Harry A. Nass, Jr., court appointed, San Antonio, for Meyer.

Ted Butler, Dist. Atty., Charles T. Conaway, John L. Quinlan, III, Douglas C. Young and David K. Chapman, Asst. Dist. Attys., San Antonio, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

GREEN, Commissioner.

In a joint trial before a jury on separate indictments, appellants Michael W. Evans and Michael W. Meyer were found guilty of murder with malice. Punishment of each appellant was assessed at 600 years in the Texas Department of Corrections.

Appellants were represented at the trial by different counsel, and separate appellants' briefs have been filed.

In appellant Evans' sixth ground of error, and in appellant Meyer's fourth ground, complaint is made that the court committed reversible error in excluding evidence beneficial to each which would tend to establish bias and motive on the part of State's witness Wayne Knock.

In order to properly consider this contention, a discussion of the evidence is necessary.

Shortly after 2:00 A.M. on January 7, 1972, deceased, Thomas C. Woodlee, was found dead in front of a Stop-N-Go store in San Antonio, of which he was night manager. He had been shot seven times with two different caliber guns, a .22 and a .32.

Clayton Tarvin testified that he and his wife had stopped at the Stop-N-Go about 2:00 o'clock that morning and he had gone in. No one was in the store proper; however, he heard noises coming from the direction of the storeroom. Presently, a man whom he identified as appellant Meyer appeared behind the counter and stated that the noise was caused by his boss, who had come in drunk. Tarvin asked for a package of cigarettes, and while the man he identified as Meyer was waiting on him he saw Woodlee, with whom he was acquainted, come running from the storeroom. Woodlee's face, forehead and shoulders were covered with blood. At the same time Tarvin saw another man, whom he described as "short, stocky and dark-headed," and wearing a black leather jacket, come from the storeroom. He had only a momentary glance at this man, and could not identify him in court, although he stated that he appeared to be the same man as appellant Evans. Tarvin then left the store in his van and went to call for help.

Tarvin's wife, who remained in the car while her husband went in the store, also identified Meyer as the man who waited upon Tarvin. She did not identify the other man.

Between five and ten minutes later, after notifying an officer of a possible robbery

at the Stop-N–Go, Tarvin returned. At 2:11 A.M., Officer Burks, responding to a radio message, arrived and found Woodlee lying dead on the sidewalk in front of the icehouse. Other officers came a few minutes later. Two .22 caliber shell casings were found lying near the body. A number of spent .32 caliber shell casings and one spent slug and a military woolen glove liner and a glove with rabbit fur lining were found in the store. Latent prints were taken from the front door of the store, one of which proved to be Meyer's palm print.[1]

Officer Brown had been in the store a short time before Woodlee was assaulted, and had talked with Woodlee. After Woodlee told him about an "incident" that had occurred before Brown's arrival, the officer went to look for a "white over brown" 1965 Pontiac which he had seen leaving the icehouse just before he arrived. He had seen two white males, one dark haired, the other light haired, in the car. Brown did not find the car.

Officers had been searching for the white and brown 1965 Pontiac seen leaving the Stop-N-Go by Officer Brown. On January 17th, Officer Thomas saw appellant Evans park such a car on a parking lot. Thomas testified that Evans and his companion matched the description of the two wanted in connection with Woodlee's murder.[2] According to Thomas, Evans agreed to go to the police station, and while there consented to a search of his car. The officers found a black leather jacket, a pair of military type gloves, and a box of .22 caliber ammunition, three-quarters full. In the trunk, a woolen "military" type of glove liner and a black leather fur lined glove were located.

Clayton Tarvin, the witness who had gone to the store at 2:00 that morning, testified that the black leather jacket ap-peared to be the same as the one worn by the man who came from the storage room behind the deceased.

Proof was given from expert witnesses that the fibers inside the woolen liner found in the car were identical with those of the liner found at the icehouse and that blood on the gloves from the car was of the same relatively rare type—type B—as deceased's blood.

State's witness Wayne Knock testified that he was acquainted with both appellants, and that Meyer and Evans knew each other and were friends. He said Meyer had told him that he and Evans were going to rent an apartment together and that he had seen them together on prior occasions in Evans' brown and white Pontiac. His was the only evidence that appellants were acquainted with each other at the time of the killing. Knock testified that on January 8th, the day after Woodlee was killed, he went with appellant Meyer to test-fire a .22 caliber Luger-type pistol belonging to Meyer. They went to a place in "the country," where, at Meyer's request, Knock fired the pistol eight or nine times into a brush pile, ejecting the shells onto the ground. Knock stated that Meyer, on this trip, asked if he had heard of the shooting at the Stop-N-Go. Meyer also told Knock that he had earlier shot his dog at the same location. The remains of the dead dog were still there.

Knock stated further that in November, 1971, he gave Meyer a set of military gloves, including the woolen inserts and the outer shells. He testified that they were identical to the gloves introduced in evidence. Knock testified that on January 19th he guided two detectives to the place where he had fired the pistol and was present when the officers found eight empty shells and a spent slug.

1. There was evidence that Meyer had been in the store on other recent occasions and that this door was the only entrance way into the store.

2. However, Evans' companion was not his co-appellant, Meyer.

Officer Castillon testified that he and another detective had gone with Knock to the location that he had directed them, where he had obtained seven .22 caliber shell casings along with another .22 casing and slug found under the dead dog.

Fred Rymers of the Texas Department of Public Safety, after qualifying as an expert on the subject, testified that he had determined after scientific examination that the two .22 shell casings found near Woodlee's body were fired from the same gun that fired the seven shells found at the brush pile by Knock and Officer Castillon.[3] The shell and slug found under the dog were fired from a different gun.

Evidence in the record reflects that Knock also fit Tarvin's description of the man who followed deceased from the storeroom, and that the jacket found in Evans' car fit Knock as well as Evans.

Neither appellant testified at the trial.

It was the State's contention at the trial and on appeal that appellants, in an attempted robbery, were beating Woodlee to force him to open a safe when Tarvin entered the store and that they shot him after Tarvin left to call for help. The State argued that appellants were "casing" the store in the 1965 Pontiac when that car was seen by Officer Brown.

The court, in submitting the case to the jury, charged on the law of principals and circumstantial evidence.

Each appellant complains that since Knock was a material State's witness, giving damaging testimony against each, the court committed prejudicial error in refusing to permit them to prove that Knock was, at the time of the trial, under felony indictment for sodomy in the same court, to show interest, bias and motive of the witness for testifying as he did.

The record reflects that appellants offered to prove before the jury, and did show on bill of exception out of the presence of the jury, that in 1972 Knock was indicted for sodomy in the same court where appellants' indictments were pending. The clerk of the court testified from the records that on each occasion that appellants' cases had been set for trial Knock's case was set to follow, and that on each instance that the cases against appellants were reset the same procedure was true concerning Knock's case. The instant trial was begun on April 4, 1973, at which time Knock's trial was set for September 4, 1973.

The State's objection, that only final convictions are admissible for impeachment of a witness, was sustained. See Article 38.29, Vernon's Ann. C.C.P. However, the offer of the testimony by appellants was based on their contention that the proof of the pending indictment was offered not for general impeachment, but to show the bias, prejudice, interest and motive of the witness in testifying as he did.

■ The Court has frequently stated that great latitude should be allowed the accused in showing any fact which would tend to establish ill feeling, bias, motive and animus upon the part of any witness testifying against him. See Seal v. State, 496 S.W.2d 621; Hooper v. State, 494 S.W.2d 846; Burkhalter v. State, 493 S.W.2d 214; Wood v. State, 486 S.W.2d 359; Jackson v. State, 482 S.W.2d 864; Fletcher v. State, 437 S.W.2d 849; Blake v. State, 365 S.W.2d 795. See also Mutscher v. State, 514 S.W.2d 905.

In Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L.Ed.2d 347 (1974), the United States Supreme Court granted certiorari from the Supreme Court of Alaska "to consider whether the Confrontation Clause

---

3. The record does not reflect that the guns were ever found. They were not introduced in evidence. However, a photograph of a .22 caliber Stoeger Luger automatic pistol, taken from a service manual, was placed in evidence. Knock testified the gun he fired at Meyer's request looked "exactly like" the pistol in the photograph.

requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as juvenile delinquent when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of juvenile adjudications of delinquency."

Richard Green, a crucial State's witness for the State, was, at the time of the trial and of the events to which he testified, on probation by an order of the juvenile court after having been adjudicated a delinquent in two burglary cases. The petitioner Davis made it clear that he was not seeking a general impeachment of Green's character as a truthful person, but rather to show specifically that at the same time Green was assisting the prosecution he was on probation and might have been under pressure to shift suspicion away from himself, and fear of probation revocation.

The Supreme Court, in holding that the trial court committed constitutional error in refusing to permit the defense to offer evidence before the jury of Green's probationary status, in part said:

"In the instant case, defense counsel sought to show the existence of possible bias and prejudice of Green, causing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court identification of petitioner.

"We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided 'a crucial link in the proof . . . of petitioner's act.' Douglas v. Alabama, supra, 380 U.S., at 419, 85 S. Ct., at 1077. The accuracy and truthfulness of Green's testimony was a key element in the State's case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer, cf. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), as well as of Green's possible concern that he might be a suspect in the investigation.

"We cannot accept the Alaska Supreme Court's conclusion that the cross-examination that was permitted defense counsel was adequate to develop the issue of bias properly to the jury. While counsel was permitted to ask Green whether he was biased, counsel was unable to make a record from which to argue why Green might have been biased or otherwise lack that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a 'rehash' of prior cross-examination. On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which ' "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314.' Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968)."

■ See, also, Luna v. Beto, 395 F.2d 35 (5th Cir. 1968), in which the court stated and discussed the rule that in Texas evidence of pending charges is admissible un-

der certain circumstances for the limited purpose of showing bias, prejudice, and motive of a witness.[4]

The witness Knock was an important witness for the State and gave testimony damaging to each appellant. Although appellant Meyer was identified as having been at the store shortly prior to the killing of deceased,[5] the evidence as to the shooting was circumstantial and involved the law of principals. Outside of the testimony of Knock, there was no evidence that the appellants knew or associated with each other. It was Knock who testified he gave the gloves to Meyer, one of which, the State argued, was found in the deceased's store, and the other in Evans' car. It was by reason of Knock's testimony of the shots fired in the trash pile that the State could connect the shell casings found near deceased's body with Meyer's gun. He also testified that the brown and white Pontiac belonged to Evans or to Evans' mother and that Evans and Meyer used it often.

Furthermore, it was shown on cross-examination that Knock was about the same size as Evans and fit the description of the second man in the store described by the witness Tarvin. The black leather jacket found in Evans' car fit Knock. Knock had a set of keys to the brown and white Pontiac, and had driven it. He owned gloves similar to those introduced in evidence and about which the expert witness testified as stated hereinabove. Knock admitting disliking appellant Evans and having had "knockdown dragout" with Meyer on New Year's eve, seven days prior to the shooting, in which he had hit Evans in the face,

blacking his eye. Knock was questioned by the police about the shooting a few days after January 7th, but was not taken in custody. He testified that he had been to the Stop-N-Go store with Meyer on two occasions prior to the time deceased was killed.

The accuracy and truthfulness of Knock's testimony was a key element in the State's case against appellants. The claim of bias, interest and motive which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Knock's vulnerable status as an indictee, as well as of Knock's possible concern that he might be a suspect in the offense. Cf. Mutscher v. State, supra.

We conclude that appellants were denied the right of effective cross-examination, which is "constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." Davis v. Alaska, supra; Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314.

Additionally, however, under the circumstances of the evidence, we do not find that the error was harmless beyond a reasonable doubt.

In view of our disposition of the appeal, it is not necessary that we consider appellant's other grounds of error. However, in the event of another trial, the trial court should give serious attention to the issue of severance.

The judgments are reversed, and the causes are remanded.

Opinion approved by the Court.

4. However, the Court of Appeals, 5th Cir., sitting en banc, held that reversible error was not shown where the defense counsel made no effort to inform the trial court that the evidence of the charge pending against the witness was offered for such purpose. The appellate court also held that error, if any, was harmless under the circumstances, since the evidence showed convictions of the witness for murder, burglary, and theft. Further, the court stated that the record did not reflect that at the time of the trial the alleged charge was pending against the witness.

5. Appellants sought to weaken Tarvin's identification by showing, on cross-examination, that he and his wife had spent the previous six or seven hours in a tavern drinking beer and that he left this tavern when it closed about 2:00 A.M.