

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,118

## EX PARTE CARLOS LUIS CAMPOS, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### FROM HARRIS COUNTY

**KELLER, P.J. delivered the opinion of the court in which MEYERS, WOMACK, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined. PRICE, and JOHNSON, JJ., concurred.**

We filed and set this application to determine whether trial counsel rendered ineffective assistance in failing to impeach two of the State's witnesses for bias and motive. We conclude that applicant has failed to satisfy the *Strickland*[1] test, and we therefore deny relief.

### I. BACKGROUND

### A. Procedural History

Applicant was indicted for murdering Alexander Pacheco on June 2, 1994. He was tried in January of 1995, but that trial ended in a mistrial because the jury was unable to reach a verdict.

_____

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

According to trial counsel's affidavit, "a slim majority of the jurors favored acquittal on the basis of self-defense."[2] Applicant was retried in June of 1995. At the second trial, the jury found him guilty, sentenced him to life in prison, and made an affirmative deadly weapon finding. The Fourteenth Court of Appeals affirmed his conviction.[3]

Applicant subsequently filed this application for habeas corpus. Among other things, the application alleges that two of the State's witnesses at the second trial – Sean Aveilhe and Lynn Harris – were on felony deferred adjudication, with motions to adjudicate pending, and: (1) the State violated *Brady v. Maryland*[4] by failing to reveal this information, or (2) defense counsel was ineffective in failing to impeach the witnesses with this information at the second trial. We remanded the case to the trial court for further proceedings, including obtaining an affidavit and making findings regarding applicant's *Brady* claim. The trial court complied with our remand order, and a supplemental record has been forwarded to us. In its supplemental findings, the trial court found that information with respect to Aveilhe and Harris was disclosed by the State to defense counsel.[5] We ordered briefing on the ineffective assistance question.[6]

---

[2] The trial court made no finding of fact regarding the credibility of this statement.

[3] *Campos v. State*, No. 14-95-00740-CR (Tex. App.–Houston [14th Dist.] June 5, 1997)(not designated for publication).

[4] 373 U.S. 83 (1963).

[5] The trial court's findings are supported by the following evidence: Affidavits from Carolyn Allen, the prosecutor at applicant's first trial, and Matthew Alford, the prosecutor at applicant's second trial, stated that the information concerning Aveilhe was in the State's file. In addition, though she had no specific recollection of her actions, Allen believed, based upon a motion in limine she drafted regarding Aveilhe's record, that she provided the information to defense counsel. In his supplemental affidavit, Alford stated that, though he had no specific memory of Harris, or her criminal history, he would have talked to Harris prior to trial. In her affidavit, Harris stated that she discussed her outstanding warrant with Alford. Further, though Alford had no specific recollection

## B. Evidence - The Underlying Events

### 1. *Inside the Store*

A recitation of the facts is necessary. On June 2, 1994, applicant shot and killed Alexander Pacheco outside a Stop-N-Go store. Certain events that occurred inside the store were recorded on videotape by a store camera, but the sound quality is poor. The State used transcripts at trial,[7] and the defendant contested the accuracy of those transcripts before the jury. An enhanced version of the videotape and a different set of transcripts that were available during a civil trial have been made part of the record of this habeas proceeding.

In rough outline, the following sequence of events can be gleaned from a review of the videotapes and of testimony concerning the events depicted: At around midnight, applicant entered a Stop-N-Go with his girlfriend, Madelyn Longoria. He began talking to the store clerk, David Michael Payne, who was a good friend of his. Alexander Pacheco entered the store, drinking from a Rolling Rock bottle, to buy some beer. When he placed two quart bottles of beer on the counter, Payne asked for his identification. Applicant commented that Pacheco did not look like he was twenty-one. Pacheco responded, "Who asked you?" Applicant replied, "Your daddy." Pacheco responded, "That shows what you know. I don't have a daddy." Applicant replied, "I'll show you how much I know," and left the store. Longoria soon followed, placing her drink on the counter

---

of whether he discussed the criminal histories of Aveilhe and Harris with defense counsel, he said that his normal practice would have been to divulge information concerning the criminal histories of the State's witnesses.

[6] *Ex parte Campos*, No. AP-76,118 (Tex. Crim. App. March 18, 2009)(not designated for publication).

[7] The jury was allowed to use the transcripts as an aid while the tape was played at trial, but the transcripts were not admitted into evidence and were not available during deliberations.

before leaving the building.[8]  As Pacheco paid for the beer, he asked Payne whether applicant carried a gun.  Payne replied that he did not know, and asked, "Why?"

Both the original and enhanced tapes are difficult to understand after this point.  The State's transcript shows Pacheco responding, "I don't know, wondering about what he went to get."  Applicant contends that the civil trial transcript more accurately depicts the conversation, with Pacheco responding, "I don't know, that's probably what he went out to get.  I will fuck him up."[9]  Payne later testified that he did not pay attention to Pacheco's answer to his question and could not relate what was said.  As Pacheco left the store, Payne walked to the door to wave to Rodney Mueller, a customer waiting to pump gasoline.

## 2. *Outside the Store*

Though accounts differ as to what happened next, the witnesses agree that applicant and Longoria got into a car with applicant on the passenger side, that Pacheco approached the car, that Pacheco was shot in the face by a gun that applicant was holding, that applicant told Longoria that they needed to leave, and that the car backed into Mueller's car and then sped away.  The undisputed evidence also shows that applicant and Longoria did not call the police and that Longoria drove to a neighborhood where applicant threw the gun into some bushes.

### a. *Mueller's Account*

Mueller was at the Stop-N-Go to buy gasoline.  He did not know any of the people at the

---

[8]  Applicant and Longoria were each holding a paper soft drink cup while standing in line to pay for the drinks.  However, applicant left the store with his cup in hand, and Longoria left the store without paying for either of the drinks.

[9]  At trial, defense counsel argued to the jury that the videotape showed Pacheco saying "I'll fuck him."

store that night. He saw what he believed to be five hispanic males leave the store, but he would later learn that one of those individuals – Longoria – was a female. Mueller said that he "really wasn't paying a lot of attention until the shooting" but "after the shooting [he] started paying a lot more attention to what was going on around [him]." Later in his testimony, though, Mueller said that he was "paying attention" before the shooting because he was at a gas station at night and was "a little bit leery."

Mueller saw applicant and Longoria get into their car and then saw Pacheco walk over to the car. "As soon as he did, [applicant] pulled out a handgun and shot him." Mueller testified that he actually saw a gun come out of the passenger side window. After the shot, Mueller heard the crash of a beer bottle. When asked whether he saw Pacheco carrying the bottles before the shooting, Mueller indicated that Pacheco had been carrying two bottles in his right hand. When asked whether he saw Pacheco raise up the bottles at any point, Mueller replied "no." On cross-examination, Mueller testified that Pacheco's right hand was blocked from view at the actual time of the shooting, but he had seen the bottles as Pacheco approached Longoria's car.

After the shooting, Mueller crouched behind a gas pump and then ran to the side of the store. He looked over to see if applicant was going to shoot anyone else, and he saw a "smile" or "grin" on applicant's face.

b. *Aveilhe's Account*

Sean Aveilhe drove with a friend to the Stop-N-Go to buy beer. Aveilhe stayed in the car while the friend went into the store. Aveilhe saw applicant talk to the friend before applicant entered the store. Aveilhe had seen applicant before but did not know who he was. Later, Aveilhe noticed that Pacheco was in the store at the counter. Pacheco was an acquaintance, but Aveilhe did not know

him very well. Aveilhe saw Pacheco walk out of the store, throw something into a trash can, and then walk toward the gas pumps. Pacheco was carrying two beer bottles at waist height. When asked whether Pacheco ever raised the bottles, Aveilhe replied, "no." As he was walking toward his own car, Pacheco made a ninety-degree turn and started walking toward Longoria's car.

When Pacheco arrived at Longoria's car, Aveilhe heard him ask applicant if he was "talking shit" to him. Applicant answered affirmatively, and then Aveilhe heard a gunshot. Aveilhe ducked down in his car, then heard a crash, as Longoria's car backed into Mueller's car. Aveilhe saw applicant motion with his hands and say, "Go, baby, go!" Longoria then drove away.

When Aveilhe's friend came out of the store, they left immediately. Aveilhe gave three reasons for leaving the scene: (1) his friend wanted to leave, (2) there was a warrant out for Aveilhe's arrest, so he did not want to be there when the police arrived, and (3) Aveilhe was afraid applicant would realize that there were witnesses to the shooting. After fleeing the scene, Aveilhe used a pay phone to call the sheriff's office.

c. *Payne's Account*

According to Payne,[10] Pacheco stopped by a trash can to throw away the Rolling Rock bottle after he left the store. He then grabbed the two beer bottles by their necks and advanced on Longoria's car. As Pacheco reached the car, he raised the bottles up over his head as if he were planning to smash them down on applicant. Then Payne heard a gunshot, and Pacheco fell to the ground. During later questioning, Payne acknowledged that he had testified at the previous trial that Pacheco confronted applicant with his hands out to his side, a gesture he had interpreted as meaning

---

[10] Though much of his testimony was friendly toward the defense, Payne was called by the State in its case-in-chief.

"if you want to fight, come on and get me."

When asked whether he watched applicant shoot Pacheco, Payne replied that he "couldn't see that far away." In a prior deposition, however, Payne had answered "yes" to whether he saw applicant shoot Pacheco. Payne said that he was near-sighted and was not wearing his glasses on the night of the shooting because they were broken. When asked how far away he was from Pacheco at the time of the shooting, Payne first answered, "I don't know." When pressed for an estimate, he replied, "Maybe three feet." Later he changed his answer to "five feet" and when asked to estimate what was five feet, he replied that it was the distance from the witness stand to the windows in the courtroom. When asked how he could see Pacheco's actions but not applicant's, Payne replied, "Because there was the light from the store on the bottles."

Payne had known applicant for five years, and they often played basketball together. Payne initially lied to the police about whether he knew applicant when confronted with applicant's image on the store videotape, and he pretended to be unable to pick applicant's picture out of a high school yearbook. Payne later acknowledged that he deceived the police in an attempt to protect his friend.

Payne also testified that applicant had shown him a gun two months before at the neighborhood park where they played basketball. When asked whether the gun applicant had shown him looked like one of the State's exhibits, Payne replied, "I don't know. I couldn't see. I told you, I was blind. My vision was blurry." After a recess, the prosecutor asked Payne again whether the gun applicant showed him looked like one of the State's exhibits, and Payne answered that it "might have been." Payne also admitted that the conversation he had with applicant on the night Pacheco was shot included talk about shooting a gun.

d. *Longoria's Account*

Longoria was applicant's girlfriend at the time of the incident and at the time of trial. She testified that Pacheco placed the two beer bottles he had bought on top of a trash can after he left the store. She then saw him grab one of the bottles by the neck and turn it "up in an upward motion." She thought he had taken the top of a bottle off and thrown it away. On cross-examination she said that he took the top off of one of the bottles and carried it upright while holding the other bottle by its neck. On further cross-examination, she admitted that, at the previous trial, she testified that Pacheco carried both bottles by the neck. After picking up the bottles, Pacheco then mumbled something to the effect of "you want some shit" and walked straight from the trash can to her car.

Longoria claimed that applicant was saying, "Let's go," but she panicked and was having trouble starting her car. She testified that there was an alarm system that prevented the car from starting if the headlights were not turned on. She also testified that the passenger window was down and was "kind of like off track" and difficult to roll up. She claimed that rolling up the window took two hands from a standing position and that it "takes awhile."

Longoria further testified that she did not realize that applicant had retrieved a gun until right before the shot went off and that she had not realized until then that a gun was in her car. The day before the shooting, applicant had directed her to a road with a grassy median, and he searched the median and found a gun there. In the six months that she had been dating applicant, she had never seen him with a gun. Applicant told her that he was retrieving the gun for a friend. She believed that he had taken the gun out of the car with some of his clothes.

Longoria also testified about applicant hiding the gun. And she testified that, holding a flashlight and using a pitcher of water, she washed off the rear bumper of her car after returning

home. She claimed that she did so to see more clearly if there was major damage to the car rather than to try "to wash off any damage" that was incurred.

e. *Applicant's Account*

Applicant testified that Payne's stepbrother Billy had been forced to abandon a gun at a party because the police had arrived. Two days before the shooting, Billy said that he had thrown the gun onto the median of a road. Though applicant did not know the exact location of the gun, he was able to retrieve it, and he left it overnight in Longoria's car. Applicant claimed that he was unfamiliar with this type of weapon and had never fired one. He took the clip out and ascertained that it did not contain any ammunition. He then went to his garage to see if some bullets he had found would fit. He claimed that he had found some bullets in a fishing box by a place called the Cliffs. Discovering that the bullets did indeed fit, applicant loaded the clip, went back to Longoria's car, and placed the clip in the glove compartment. The gun itself remained underneath the front passenger seat. When applicant was at the store on the night of the shooting, he talked to Payne about shooting the gun sometime.

Applicant testified that, when he walked out of the store, he was ready to "bump chests and kiss lips," by which he meant a verbal confrontation where he and Pacheco would "get in each other's faces." This could lead to "hitting each other" if they kept "talking back to each other rudely." But Pacheco did not leave the store right away, so applicant cooled down and decided to get in Longoria's car.

Once he was in the car, applicant saw Pacheco leave the store and walk to a garbage can. Pacheco then started making "smart-aleck" statements to applicant, picked both beer bottles up by their necks, and, holding the bottles at shoulder or head height, walked towards Longoria's car.

While Pacheco was advancing on the car, applicant told Longoria a couple of times, "Get the car started! Come on, let's go, let's get out of here!" Applicant also reached into the glove compartment to grab the clip and reached underneath his seat to grab the gun. Applicant inserted the clip into the gun, began pulling the slide back, and held the gun up to the window. Then the gun jerked forward and went off. Though applicant had his finger on the trigger, he testified that he had did not mean to shoot it. Applicant claimed he was in fear for his life at the time he retrieved the gun because Pacheco could have smashed him on the head with the beer bottles. The prosecutor had applicant demonstrate for the jury his actions of retrieving the gun and the clip and putting them together.

According to applicant, when the shot went off, he said "My God, he's shot!" and then said something like, "What should I do?" and, "Let's go," and, "Go, baby." Applicant further testified that he directed Longoria to a neighborhood that he was not very familiar with and that he threw the gun into some bushes. He threw the gun away because he "just didn't want the gun anymore."

### 3. *Before the Incident - Lynn Harris & Jean Dugas*

Lynn Harris did not testify at the first trial but testified at the second trial. Jean Dugas testified at the the first trial but did not testify at the second trial, though he was under subpoena.

At the second trial, Harris testified that, on May 27, 1994, she attended a high school graduation party, where she saw applicant. During the party, applicant grabbed Jean Dugas's hand and placed it on applicant's stomach, while saying, "I don't have to worry about nothing. We don't have to worry about nothing. I am just waiting for someone to talk shit to me." Later, when the police arrived at the party, applicant stated, "What am I going to do? What am I going to do? I got this gat." Harris explained that "gat" was a slang term for a gun. As applicant was talking, his shirt came up, and Harris saw the black handle of a gun.

Harris also made a statement to the police about the incident on June 3, 1994. In that statement she said:

> Carlos placed the palm of John's[11] hand on his stomach so that John could feel something he had under his shirt. The shirt wasn't tucked in. Carlos told John, "I'm not worried about nothing. I'm waiting for someone to say something so that I can shoot them." Carlos walked away with his girlfriend.
>
> Later on that night the police came and broke up the party. As we were getting ready to leave Carlos walked up to us and pulled up his shirt several times. I saw that he had a gun under his shirt. He was very nervous. He was talking with Thomas McSwain. He was trying to decide whether or not to leave. He was afraid the police were going to find his gun.

At the first trial, Dugas testified about the same incident. He said that at a party in May 1994, applicant grabbed Dugas's hand and placed it on a gun tucked in applicant's waistband, while saying that if anyone started to mess with him, he'd shoot them.

## C. The Impeachment Information

On March 28, 1991, Aveilhe was placed on deferred adjudication for possession of LSD with intent to deliver. In May of 1992, the State filed a motion to adjudicate guilt, and a capias for Aveilhe's arrest was issued. Aveilhe was adjudicated guilty on October 6, 1995 and sentenced to five years in prison, but he was granted shock probation on December 1, 1995.

On March 2, 1994, Harris was placed on deferred adjudication for burglary of a habitation. Between applicant's first and second trials, Harris moved to North Carolina, in violation of her conditions of supervision, because her father was ill. On February 21, 1995, the State filed a motion to adjudicate guilt. The motion to adjudicate was overruled by agreement on May 13, 1996, but her guilt was later adjudicated, and she was sentenced to five years in prison.

---

[11] "John" is Jean Dugas.

## II. ANALYSIS

An applicant must show two things to establish ineffective assistance of counsel under *Strickland*: (1) deficient performance by counsel and (2) prejudice.[12] To establish deficient performance, the defendant must show "that counsel's representation fell below an objective standard of reasonableness."[13] To establish prejudice, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[14] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[15]

### A. Deficient Performance

We turn first to the question of deficient performance. We measure counsel's performance "against the state of the law in effect during the time of trial."[16] Counsel is not held responsible for later judicial decisions that change the law, nor can he be found ineffective if the law was unsettled at the time counsel acted on the defendant's behalf.[17] In assessing defense counsel's performance in the present case, we find it helpful to trace the development of the law with respect to the type of impeachment claims at issue here.

In *Davis v. Alaska*, the Supreme Court of the United States held that the Confrontation

---

[12] 466 U.S. at 687.

[13] *Id.* at 688.

[14] *Id.* at 694.

[15] *Id.*

[16] *Ex parte Roemer*, 215 S.W.3d 887, 894 (Tex. Crim. App. 2007).

[17] *Id.*

Clause of the Sixth Amendment[18] required that the defendant be permitted to impeach a witness with evidence that showed that the witness had a vulnerable relationship with the State.[19]  In *Davis*, a bar was burglarized, and the safe was taken.[20]  The safe was ultimately recovered near the house of one of the State's witnesses.[21]  This witness identified the defendant as carrying a crowbar and standing beside a car in the location where the safe was later found.[22]  The defendant was not allowed to present evidence that this witness was on probation for juvenile delinquency for burglaries of his own.[23]  In holding that the trial court erred in excluding the evidence, the Supreme Court observed:

> The accuracy and truthfulness of [the witness's] testimony were key elements in the State's case against [the defendant].  The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness's] vulnerable status as a probationer, as well as of [the witness's] possible concern that he might be a suspect in the investigation.[24]

Although a number of Texas cases have addressed the holding in *Davis*, we discuss several that represent the evolution of *Davis*'s progeny in this state.  In *Evans v. State*, the prosecution witness was under indictment for an unrelated offense, but he was a potential suspect in the offense for which the defendant was charged, and the accuracy of the witness's testimony was crucial to the

---

[18]  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST., Amend. 6.

[19]  415 U.S. 308 (1974).

[20]  *Id.* at 310.

[21]  *Id.*

[22]  *Id.*

[23]  *Id.* at 310-11.

[24]  *Id.* at 317-18 (citation and footnote omitted, bracketed material substituted for original).

State's case.[25]  We held that the trial court erred, under *Davis*, in refusing to permit impeachment based on the pending criminal charge.[26]  In *Randle v. State*, the prosecution witness was under indictment for an unrelated offense but was *not* a potential suspect for the offense for which the defendant was charged.[27]  Nevertheless, we held that the witness's pending charge "was admissible to afford a basis for an inference of undue pressure due to his status as an indictee."[28]

However, in *Carmona v. State*, we held that "the principle of *Davis v. Alaska* is not offended when a defendant is prohibited from asking a witness about an unrelated pending charge, provided that the defendant has otherwise been afforded a thorough and effective cross-examination and where . . . the bias and prejudice of the witness is . . . patently obvious."[29]  And in *Callins v. State*, we held that  the rule in *Davis* was not violated by the refusal to permit the defendant to impeach a witness with his status of being on deferred adjudication, where the defendant made no showing that the witness's testimony was "a result of bias, motive or ill will emanating from his status of deferred adjudication."[30]

In two later cases, decided after applicant's trial, this Court backed away from the holdings in *Carmona* and *Callins*.  In *Carroll v. State*, this Court held that the Confrontation Clause requires

---

[25]  519 S.W.2d 868, 871-73 (Tex. Crim. App. 1975).

[26]  *Id.* at 873.

[27]  565 S.W.2d 927, 929-30 (Tex. Crim. App. 1978).

[28]  *Id.* at 931.

[29]  698 S.W.2d 100, 104 (Tex. Crim. App. 1985).

[30]  780 S.W.2d 176, 196 (Tex. Crim. App. 1989); *see also Jones v. State*, 843 S.W.2d 487, 496 (Tex. Crim. App. 1992)(citing *Callins*).

that a defendant always be permitted to impeach a witness with the existence of a pending criminal charge.[31] Judge Keller dissented, contending that prior precedent did not require admission of pending charges in every case.[32] "[O]rdinarily, the mere existence of a pending charge gives rise to an inference that the witness may have been influenced," she said, "But in some cases, additional facts in the record may show that such an inference is not warranted."[33] Concluding that *Carroll* was such a case, Judge Keller observed that the witness was charged with aggravated robbery *after* he gave the police a statement regarding the offense with which the defendant was charged, and the witness's earlier statement was entirely consistent with his later testimony.[34] In *Maxwell v. State*, the Court disavowed the rule in *Callins* that something must be shown beyond the witness's deferred adjudication status before impeachment must be allowed under the Confrontation Clause.[35]

Applicant was tried after *Carmona* and *Callins* but before *Carroll* and *Maxwell*. Under *Callins*, in order to be entitled to impeach Aveilhe and Harris, applicant had to show more than that they had pending deferred adjudications. Applicant did so: Not only did the witnesses have pending deferred adjudications, but they also had pending motions to adjudicate.

The existence of motions to adjudicate is significant. It could be argued that a person may believe that he has nothing to worry about if deferred adjudication supervision is being served in a satisfactory manner. Such a person may believe that if he just continues to meet the conditions of

---

[31] 916 S.W.2d 494, 497-98, 501 (Tex. Crim. App. 1996).

[32] *Id.* at 505, 505 n.2 (Keller, J. dissenting)(citing *Carmona*).

[33] *Id.* at 505.

[34] *Id.* (emphasis in original).

[35] 48 S.W.3d 196, 198-200 (Tex. Crim. App. 2001).

supervision, then there is nothing that the State can or will do to him. But if a motion to adjudicate is pending, then the person does have something to worry about. Such a person is in essentially the same position as a person with pending charges. His fate is no longer in his own hands, and the possibility of currying favor becomes more evident. The pre-*Carroll* caselaw at least suggested that pending charges were generally enough to raise an inference that the witness's testimony flowed from a vulnerable relationship, for which the witness could be impeached, though under that caselaw there was still the possibility that additional circumstances could negate such an inference.

With respect to Harris, there were additional circumstances that might negate such an inference. Although Harris was on deferred adjudication, no motion to adjudicate was pending when she gave her statement to the police. In fact, the conduct that would later become the basis for the State's motion had not yet occurred. Harris's testimony at applicant's second trial was consistent with, and no more incriminating than, her earlier statement. Under pre-*Carroll* caselaw, then, a defense attorney could have reasonably believed that Harris's trial testimony was not influenced by the vulnerable relationship she had with the State because that relationship arose after her earlier statement to the police. Even if defense counsel were unaware of Harris's pending motion to adjudicate at the time of applicant's trial, defense counsel's failure to discover the motion to adjudicate would not constitute deficient performance because it would have been reasonable to assume that Harris's statement to the police fixed the relevant point in time for determining any influences bearing upon her credibility.

The same cannot be said with respect to Aveilhe. The State had filed its motion to adjudicate over two years before the shooting at issue here. Though Aveilhe was never a suspect in this case, during all stages of the investigation and prosecution, he was subject to having his offense

adjudicated. He no longer had the assurance that he could retain his liberty if he followed the conditions of his supervision. He had an obvious incentive, even under the caselaw prior to *Carroll* and *Maxwell*, to curry favor with the State in an effort to derail the proceedings against him. Trial counsel does not claim in the habeas proceedings to have had a trial strategy for failing to impeach Aveilhe with the information relating to his deferred adjudication and the motion to adjudicate; counsel claims that he was unaware of the evidence because the State had not disclosed it. We did not file and set on the issue of appellant's *Brady* claims and we need not say much here except to observe that the record supports the trial court's findings that the information was disclosed to defense counsel. Consequently, we conclude that counsel was deficient in failing to impeach Aveilhe with this information.

## B. Prejudice

We next move to the question of prejudice. We first observe that the jury was not entirely ignorant of Aveilhe's legal troubles. Aveilhe himself testified that one reason he did not remain at the scene was that there was an outstanding warrant against him.

Much more significant was the other evidence against applicant. It was undisputed that applicant shot Pacheco. The only question was whether the shooting was a murder, an accident, or self-defense. No one testified that Pacheco had anything that could be used as a weapon other than a couple of beer bottles. Applicant and his girlfriend were inside their car when Pacheco approached them. Had they driven away at that point, Pacheco would have posed no threat to them. Or applicant could have rolled up his window to keep himself out of Pacheco's reach. Instead, he shot Pacheco, and afterwards fled the scene with his girlfriend.[36] During their flight, they hid the murder

---

[36] Flight is evidence of guilt. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007).

weapon. And they never called the police. This sequence of events, by itself, strongly inculpated applicant, and the defense's exculpatory explanations were not particularly compelling.

For instance, Longoria claimed that the car would not start because she panicked and was having difficulty with the unusual alarm system in the car. Her testimony, though, was that the alarm system prevented the car from starting if the headlights were not turned on. Even if true, all she had to do was turn on the lights.

Another explanation that was too convenient was the claim that applicant retrieved the gun for a friend the day before, and that gun – a Beretta – just happened to be compatible with some ammunition – hollow point bullets – that he had previously happened to find in a fishing box. Despite his friend's vague description, applicant was able to locate the gun fairly quickly, and despite the fact that it was not his gun, applicant decided to see if the bullets he had found were compatible with it.

Other evidence refuted the claim that applicant came into possession of a gun only the day before and tended to rebut any claim that he was unfamiliar with this type of gun or guns in general. Payne admitted that he had seen applicant with what could have been a similar gun two months before the shooting. Harris testified that she saw applicant with a gun at a party less than a week before the shooting. Harris also testified to applicant's eagerness to use the gun, as he was "just waiting for someone to talk shit" to him.[37]

---

[37] We consider the full impact of Harris's testimony in our prejudice analysis because of our prior conclusion in this opinion that counsel did not perform deficiently in failing to impeach her. However, even if Harris had been impeached, the State would have then been able to admit her prior statement to the police as a prior consistent statement to rebut a charge of recent fabrication or improper influence or motive. *See* TEX. R. EVID. 801(e)(B). In addition, the State could have decided to introduce Dugas's testimony, which would have confirmed applicant's possession of a gun and, if not his eagerness, then at least his willingness to use it.

The three witnesses that presented the defense side of the story – Payne, Longoria, and applicant – were obviously biased and their testimony was not very credible. Applicant's interest in the case is obvious, and Longoria was his girlfriend. Longoria also tried to cover up the events of the evening of the shooting by washing the area of her car that had collided with Mueller's car. Payne was a friend applicant had known for five years and played basketball with. Payne tried to cover for applicant by pretending to be unable to identify him to the police. And the credibility of Payne's description of events is undermined by the fact that he was nearsighted and was not wearing glasses. Payne also had difficulty estimating how far away Pacheco was from applicant at the time of the shooting.

The bottom line is that the State did not need Aveilhe's testimony. The undisputed evidence regarding the events of the evening was highly incriminating and the witnesses testifying in applicant's favor were obviously biased. The only really incriminating evidence that Aveilhe testified to that was not admitted to by applicant was that Pacheco was holding the beer bottles in a non-threatening manner. But testimony to that effect was given by another eyewitness, Mueller, who was not in a vulnerable relationship with the State and had no axe to grind. Further, the State was able to impeach both Payne and Longoria on this subject with inconsistent testimony from the previous trial. And even if Aveilhe had been impeached, his testimony would still have been before the jury. Given the highly incriminating circumstances, and Mueller's direct testimony, impeaching Aveilhe with his vulnerable relationship with the State would not likely have led the jury to disbelieve Aveilhe's testimony, much less affect the outcome of the case.

## C. Conclusion

We conclude that applicant has failed to meet the deficient performance prong of *Strickland*

with respect to Harris's testimony and has failed to meet the prejudice prong with respect to

Aveilhe's testimony.  Consequently, we deny relief.


Delivered: December 16, 2009
Do not publish